*In the Matter Of:*

PETER CALAUTTI

-vs-

JAMES SHANAHAN, ET AL.

PIETRO TOMMASO CALAUTTI

September 26, 2018



**CONNOR REPORTING**
111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

EXHIBIT 1

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
 2              INDIANAPOLIS DIVISION
 3      Civil Action No. 1:18-cv-00119-TWP-DML
 4
    PETER CALAUTTI,                    )
 5                                     )
                    Plaintiff,         )
 6                                     )
        -vs-                           )
 7                                     )
    JAMES SHANAHAN, in his             )
 8  individual capacity,              )
                                       )
 9  SAA BOARD OF REVIEW MEMBERS        )
    ONE, TWO, THREE, FOUR, FIVE,      )
10  AND SIX, in their individual      )
    capacities,                        )
11                                     )
    and                                )
12                                     )
    LAUREN ROBEL, individually,       )
13  and in her official capacity      )
    as Provost of Indiana             )
14  University, Bloomington,          )
                                       )
15                  Defendants.  )
16
17     DEPOSITION OF PIETRO "PETER" TOMMASO CALAUTTI
18
19         The deposition upon oral examination of
    PIETRO "PETER" TOMMASO CALAUTTI, a witness produced
20  and sworn before me, Tara Gandel Hudson, RPR, CRR,
    a Notary Public in and for the County of Marion,
21  State of Indiana, taken on behalf of the Defendants
    at the offices of Taft Stettinius & Hollister LLP,
22  One Indiana Square, Suite 3500, Indianapolis,
    Marion County, Indiana, on the 26th day of
23  September, 2018, scheduled to commence at
    9:30 a.m., pursuant to the Federal Rules of Civil
24  Procedure with written notice as to the time and
    place thereof.
25
```

**Page 2**

```
 1                  APPEARANCES
 2  FOR THE PLAINTIFF:
    Peter Calautti
 3
         Jay Meisenhelder
 4       JAY MEISENHELDER EMPLOYMENT & CIVIL RIGHTS
         LEGAL SERVICES, P.C.
 5       650 N. Girls School Road, Suite B20
         Indianapolis, IN  46214
 6       317.231.5193
         jaym@ecrls.com
 7
 8  FOR THE DEFENDANTS:
    James Shanahan, et al.
 9
         Melissa A. Macchia
10       TAFT STETTINIUS & HOLLISTER LLP
         One Indiana Square
11       Suite 3500
         Indianapolis, IN  46204-2023
12       317.713.3500
         mmacchia@taftlaw.com
13
14  ALSO PRESENT:
15       Melinda Mears
16
17            INDEX OF EXAMINATION
                                       PAGE
18
    DIRECT EXAMINATION .............................5
19     Questions by Melissa A. Macchia
    CROSS-EXAMINATION ............................154
20     Questions by Jay Meisenhelder
21
22
23
24
25
```

**Page 3**

```
 1
 2              INDEX OF EXHIBITS
                                       PAGE
 3  Deposition Exhibit:
 4  Exhibit  1 - 8-17-16 Email chain; Spotts .......20
                 to
 5               01882-001-2016.indiana-advocate@
                 advocate.symplicity.com
 6
 7  Exhibit  2 - 8-18-2016 Letter, Spotts to .......34
                 Calautti
 8  Exhibit  3 - 9-1-2016 Notes of meeting ........42
                 between Calautti and Spotts
 9
    Exhibit  4 - 9-6-2016 Letter, Spotts to .......51
10               Calautti
11  Exhibit  5 - 10-5-2016 Email exchange, ........54
                 Weaver to Shanahan
12
    Exhibit  6 - 10-5-2016 Email with .............67
13               Attachment, Shanahan to Calautti
14  Exhibit  7 - 10-13-2016 Email Exchange, .......72
                 Shanahan to Sanders
15
    Exhibit  8 - 11-28-2016 Report of .............79
16               Bloomington Faculty Council
                 Student Affairs Committee
17               Mediation Panel
18  Exhibit  9 - 12-9-2016 Email, Shanahan to .....81
                 Calautti
19
    Exhibit 10 - 6-24-2018 Forwarded email, .......85
20               Calautti to self
21  Exhibit 11 - 12-14-2016 Letter, Calautti ......89
                 to Student Academic Appointee
22               Board of Review
23  Exhibit 12 - 2-22-2017 Memorandum, ............98
                 Calautti to SAA Board of Review
24
    Exhibit 13 - 6-24-2018 Forwarded Email, ......101
25               Calautti to self
```

**Page 4**

```
 1              INDEX OF EXHIBITS
                                       PAGE
 2  Deposition Exhibit:
 3  Exhibit 14 - 4-11-2017 Confidential ..........111
                 memorandum, SAA Board of Review
 4               to Provost Robel
 5  Exhibit 15 - 4-26-2017 Email with ............113
                 attachment, Sanders to Robel
 6
    Exhibit 16 - 5-3-2017 Email with .............114
 7               attachment, Calautti to Robel
 8  Exhibit 17 - 5-15-2017 Email with ............115
                 attachment, Robel to Calautti
 9
    Exhibit 18 - 8-27-2017 Email with ............120
10               attachment, Calautti to
                 nayade@lymelgroup.com
11
    Exhibit 19 - Complaint and Demand for Jury ...129
12               Trial
13  Exhibit 20 - Application and Agreement for ....139
                 Student Academic Appointee
14
    Exhibit 21 - Plaintiff's Rule 26(a) ..........147
15               Initial Disclosures
16  Exhibit 22 - Plaintiff's Answers to ..........148
                 Defendants' First
17               Interrogatories
18
19
20
21
22
23
24
25
```



**5**

1  (9:28 a.m.)
2       PIETRO "PETER" TOMMASO CALAUTTI,
3  having been first duly sworn to tell the truth, the
4  whole truth and nothing but the truth relating to
5  said matter, was examined and testified as follows:
6
7  DIRECT EXAMINATION,
8     QUESTIONS BY MELISSA A. MACCHIA:
9  Q  Mr. Calautti, would you please state your name
10     for the record.
11 A  My legal name or what I commonly go by?
12 Q  Legal name.
13 A  Pietro Tommaso Calautti.
14 Q  Could you spell that for court reporter.
15 A  Sure thing. First name is P-I-E-T-R-O, middle
16    name is T-O-M-M-A-S-O, last name is
17    C-A-L-A-U-T-T-I.
18 Q  Do you go by "Peter"?
19 A  Generally, yes.
20 Q  Do you mind if I call you "Peter," or do you
21    prefer "Mr. Calautti"?
22 A  Not at all. You can call me "Peter."
23 Q  Great.
24       As I said, I'm Melissa Macchia. I'm with
25    Taft; I represent the defendants in this

**6**

1    lawsuit. With me I have Melinda Mears. She's a
2    paralegal in my office.
3       Have you had your deposition taken before?
4  A  Never have, no.
5  Q  I'll go over some kind of, we say "deposition
6    rules," whatever, just so you know what to
7    expect. So basically, I'll just ask you
8    questions. To your best recollection, answer
9    the questions. If you --
10      I will ask bad questions. It's inevitable.
11   If you don't understand something or what I'm
12   saying, feel free to let -- ask me to rephrase
13   or repeat a question.
14      Anytime you want to take a break, feel free
15   to let me know and we can take a break. I can
16   show you where the restrooms are. There are
17   snacks in the kitchen.
18      My understanding is, do you have a flight
19   out today?
20 A  Yes, I do. It's at 7:00 p.m.
21 Q  Okay.
22 A  I figured it would give us plenty of time.
23 Q  I wanted to make sure we didn't have any time
24   constraints or anything like that. This won't
25   go all day by any means, but I just wanted to be

**7**

1    sure, make sure it wasn't like 3:00 or
2    something.
3  A  I appreciate that. Thank you.
4  Q  And also -- last thing -- since we do have a
5    court reporter, just make sure you answer
6    verbally. A shake of the head or nod or
7    "uh-huh" sometimes doesn't show up very well in
8    the transcript.
9  A  Understood. Thank you.
10 Q  No problem.
11       What is your date of birth?
12 A  March 29, 1983.
13 Q  What is your current address?
14 A  216 Jersey Avenue, Cliffside Park, New Jersey --
15    Cliffside, one word; Park, separate word --
16    07010.
17 Q  How long have you lived there?
18 A  Three, four weeks, I would say at this point.
19    Not very long.
20 Q  Did you move to New Jersey straight directly
21    from Indiana?
22 A  No. I left Indiana, let's see, late April,
23    early May of this year. I've lived in Florida
24    for about two and a half to three months and
25    then moved to New Jersey.

**8**

1  Q  If you still lived in Florida, I would have gone
2    down there to take your deposition now.
3       Are you married?
4  A  I'm not. No.
5  Q  Where did you go to undergrad?
6  A  Rutgers University in New Brunswick, New Jersey.
7  Q  What was your major there?
8  A  Journalism and media studies.
9  Q  What year did you graduate?
10 A  2005.
11 Q  Did you finish in four years?
12 A  Yes, I did.
13 Q  Did you go directly to grad school?
14 A  No, I did not. I really had no intention of
15    going to grad school at the time. So I went on,
16    tried to get a professional career in
17    journalism.
18 Q  Did you start a job after undergrad then?
19 A  Yes, I did.
20 Q  Where was that?
21 A  It was at HSH Associates, I believe, which was a
22    publisher of personal finance information.
23 Q  What was your job position there, if you
24    remember?
25 A  Web content technician or something along those



**9**

1    lines.
2 Q   Did you stay in that position until you went to
3       grad school or did you have other --
4 A   No.  I'm trying to recall.
5          After that, I worked at Worth magazine in
6       New York City; then also for BurrellesLuce,
7       which is a public relations and public opinion
8       monitoring firm, so in the same realm of media;
9       and then I went to grad school.
10 Q  Where did you go to grad school?
11 A   Middle Tennessee State University.
12 Q  What made you decide to go to grad school?
13 A   I simply felt unstimulated by the professional
14       world.  I wanted to get back into a more
15       academic setting.
16 Q  Sure.  Makes sense.
17          What was your degree in grad school then?
18 A   I got a master's of science in mass
19       communication.
20 Q  From there did you go directly into a Ph.D.
21       program?
22 A   No.  I took time off.  Took me quite a while to
23       write my master's thesis, two years or so.  In
24       that period of time, I was not actively a
25       student taking courses, so to speak.

**10**

1 Q   Do you get unlimited time to write your thesis,
2       or how does that work?
3 A   There's a finite amount of time.  I don't know
4       offhand what it would be.  It's on the span of
5       years, I'm imagining.
6 Q   Do you get your degree after your thesis is
7       done, then?
8 A   Yes.
9 Q   What year would that have been?
10 A   That wasn't until officially, I believe, 2015 or
11       2016 -- I'd have to double-check on that -- but
12       I was already admitted as a Ph.D. student at IU.
13 Q  By that time?
14 A   Yes.  They admitted me under the condition that
15       I finish my thesis on time, and I did.
16 Q  Sure.  What was your thesis about?
17 A   It's kind of hard to describe in so many words,
18       really, but it's about, broadly speaking,
19       bodybuilding media, I guess.  Not a lot of work
20       has been done on it, so it was a fresh area for
21       me to go into.  If you want me to go into more
22       detail, I would be happy to.
23 Q  No.  That's okay.
24          And so you then would have enrolled at IU
25       in the fall of 2015?

**11**

1 A   Mm-hmm.
2          Correct.  Yes.
3 Q   What Ph.D. program did you enroll into?
4 A   The Media School.
5 Q   Would that have been a Ph.D. in --
6 A   That's the thing.  It was so new, they didn't
7       really have a name for the degree.
8          It was a merger of three previous
9       departments, and they all kind of got mashed
10       together.  I don't recall what the exact degree
11       would have said.
12 Q  Do you know, was The Media School newer at that
13       time --
14 A   I was part of the inaugural class.
15 Q  Did you apply anywhere else for a Ph.D. program?
16 A   Yes, I did.
17 Q  Where else did you apply?
18 A   To the best of my recollection, University of
19       Iowa, University of Pennsylvania, New York
20       University, Columbia University.  Definitely one
21       other.  I remember there were five.
22          I can't recall at the time.  Sorry.
23 Q  Not a memory test.  Just as best as you can
24       remember is great.
25          Why Indiana?  Why did you choose Indiana?

**12**

1 A   I had spoken to my committee chair for my thesis
2       and for advice on where to apply.  She
3       recommended Indiana because she was familiar
4       with some of the faculty there and knew that
5       they had a pretty good program for what I was
6       interested in.
7 Q   Why did you ultimately choose IU over the
8       others?
9 A   To be honest, it was a financial matter.  They
10       gave me the best compensation package.
11 Q  So do you find out -- let me rephrase that.
12          When, along the application process, do you
13       find out what type of aid or student assistance
14       you'll get?
15 A   Early in the year, say winter, early spring,
16       around that period of time.
17 Q  So you get that information before you would
18       have to make a decision?
19 A   Correct.  Yes.
20 Q  What was the package that IU offered?
21 A   It was full funding for the first four years
22       guaranteed, which included a stipend, health
23       insurance, a tuition waiver, and the position
24       itself, which was the ability to teach and
25       conduct research under the assistance and



---

13

1    guidance of a professor.
2 Q   Is that a student academic appointee?
3 A   Correct.
4 Q   And within the umbrella of student academic
5      appointees, are there different types?  Is there
6      a research assistant? a teaching assistant?  Are
7      they all the same?
8 A   We're all sort of in the same pool, but they can
9      assign us different roles.
10 Q   What was your role when you started in August of
11     2015?
12 A   I was assigned to the Media 101 class, which was
13     the introductory class.  It was a huge lecture,
14     1200 students or something like that.  I was
15     assigned as a teaching assistant for that class,
16     one of four.
17          And my role was primarily to answer student
18     questions, get feedback, some grading.  But
19     primarily, it was on Fridays, they have -- I
20     forget the exact name -- but they break up the
21     class into 25-student smaller classes, and I
22     would teach three of those classes.
23 Q   Did you have grading responsibilities?
24 A   Yes, I did.
25 Q   Was that for both semesters?

---

14

1 A   No.  My second semester, I was assigned a
2      different course.  It was a much smaller course.
3      I believe it was called "Behind the Prize,"
4      which was sort of a history of the Pulitzer
5      Prize.  I was the only teaching assistant for
6      that course.  But that didn't have a separate,
7      like, "breakup into smaller things" kind of
8      thing.
9 Q   Was your role different, then, since there
10     wasn't that breakup component?
11 A   There was less direct teaching, but I was still
12     grading students.  I was still answering their
13     emails.  All the rest of it remained the same.
14 Q   Do you know how the placement process works
15     for -- so if more than one student is going to
16     be a teaching assistant, how is it decided
17     whether you go to this professor or this class?
18 A   Sort of an informal process.  At some point
19     before the semester begins, we are emailed a
20     list of what our preferences would be.  And we
21     write those down.  We hand them into the office
22     secretaries and they take it from there.  We may
23     get our preferences; we may not.  It depends
24     who's available, what the schedules are, and so
25     on.

---

15

1 Q   Do you know who makes the decision on where to
2      put everybody?
3 A   Ultimately, no.
4 Q   Is every Ph.D. student an -- can I call it
5      "SAA," student academic --
6 A   Yes.  No problem.
7 Q   Is every Ph.D. student an SAA?
8 A   Yes.
9          I should clarify that actually.
10 Q   Sure.
11 A   There's a period of time where we're guaranteed
12     funding to be an SAA.  And after that is
13     expired, we can apply.  But generally that
14     application is approved.
15 Q   Do you know how long that guaranteed-funding
16     part typically is?
17 A   I imagine it varies, but I can't say for
18     certain.
19 Q   Varies per student?
20 A   Yes.
21 Q   So when you got assigned to a different course
22     the second semester, did you have to do that
23     process over again where you pick your
24     preferences, so it's semester by semester?
25 A   It's semester by semester.  We're not generally

---

16

1      expected to stay at the same course the entire
2      four years.  We're expected to sort of rotate
3      into different things.
4 Q   The tuition stipend, is that payment for the SAA
5      position or is that separate?
6 A   It's considered part of the compensation.
7 Q   Is there any other salary or anything on top of
8      that?
9 A   Yes.  There's a small stipend and a full health
10     insurance as well.
11 Q   Do you remember what your stipend was?
12 A   It's approximately $13,700 a year broken up into
13     ten payments over the course of the year.
14 Q   Also whatever tuition would have been at that
15     time?
16 A   Yes.  I'm not actually billed for tuition.  I
17     don't have to front that money or anything like
18     that.
19 Q   What about, is there any other stipend for room
20     and board or anything?
21 A   No.
22 Q   Do Ph.D. students ever take summer classes?
23 A   Occasionally, I imagine.  Yes.  But I personally
24     have not.
25 Q   If you have a tuition waiver, do you know if

---



17

1    that would also cover extra summer classes or
2    anything like that?
3  A  I can't say for certain.  I don't know.
4  Q  Did you hold any other employment at IU while
5    you were a teaching assistant or an SAA?
6  A  Did not.  No.
7  Q  Then in August of 2016, you got a new position
8    as an SAA; is that right?
9  A  Correct.  Yes.
10 Q  What was that?
11 A  I was assigned to a research role.
12 Q  Was that for a specific professor or class?
13 A  Yes.  I was assigned to the chair of my advisory
14   committee.
15 Q  What was his or her name?
16 A  Stephanie DeBoer.  D-E-B-O-E-R, I believe.  It's
17   separate from Boer.
18     It's two separate words, D-E, space, Boer.
19 Q  I forgot to ask, your first two semesters in
20   2015 and then spring 2016, did you get one of
21   your preferences?
22 A  I don't believe they even asked for a preference
23   the first semester.  The second semester I did
24   not, no.
25 Q  August 2016, was that one of your preferences?

18

1    The research assistant?
2  A  Oh, no.  Not at all.
3  Q  What did you want?
4  A  Umm --
5  Q  If you can remember.
6  A  I really can't recall.  But I never wanted a
7    research position, to be honest.  I enjoyed
8    teaching quite a bit.  I never requested
9    anything along those lines.  It would have
10   been -- I think it was a list of your top five.
11   All five of them would have been teaching roles.
12 Q  And this role would not have had any teaching
13   component to it?
14 A  Not at all.  No.
15 Q  Did you complete the semester?
16 A  Yes, I did.
17 Q  Did you have a new SAA role the spring semester?
18 A  I did not, no.
19 Q  Did you still continue taking classes that
20   semester?
21 A  Yes, I did.
22 Q  Was your tuition waiver still honored?
23 A  I believe, yes, it was.
24 Q  Through the end of the year?
25 A  Yes.

19

1  Q  How about the $13,700 stipend?  Did that still
2    get honored?
3  A  The remaining five payments for that year were
4    honored.  Yes.
5  Q  Health insurance too?
6  A  I never used it that semester.  I didn't know
7    for certain if it would or wouldn't, so I didn't
8    want to risk it.
9  Q  Do you currently have a Facebook account?
10 A  I do not, no.
11 Q  When did you get rid of your Facebook account?
12 A  I want to say October or thereabouts, somewhere
13   in the fall of 2016.
14 Q  Did you ever reopen it after that time?
15 A  I did not, no.
16 Q  Do you have any other social media accounts?
17 A  Presently, no.
18 Q  Have you ever?
19 A  I did, for a brief period of time, have an
20   Instagram account.  Yes.
21 Q  About when did you get rid of that?
22 A  I would say about spring of this year.
23 Q  Any particular reason?
24 A  It was a day or two after Mark Zuckerberg gave
25   his testimony before Congress.  Instagram being

20

1    a Facebook property, I no longer really felt
2    comfortable being on his network.
3  Q  When you did have Facebook, did you have just
4    one account?
5  A  Yes, I did.  Just my personal account.
6  Q  Do you remember what the name was that you used
7    on it?
8  A  My legal first name and last name.
9  Q  I think now the new norm is to use these code
10   names.  I just wanted to check.
11     Do you know who Mohammed Bagha is?
12 A  No, not really.
13 Q  Never met this person in person?
14 A  Never have.  No.
15 Q  But you're aware of him based on what happened
16   at IU?
17 A  Yes.  To the extent that someone could be aware
18   of someone.  Yeah.
19 Q  Sure.
20     When did you first become aware of him and
21   the postings in question?
22 A  Mid to late August of 2016.
23     (Deposition Exhibit 1 was marked for
24   identification.)
25 Q  I'll give you a minute to take a look at that.



**21**

1     My first question will be, have you seen it
2   before?
3 A  Yes, I've seen this before.
4 Q  Do you remember when that would have been?
5 A  Very early September of 2016.
6 Q  If you flip to the second page of that.
7 A  Mm-hmm.
8 Q  So this first block here -- first, for lack of a
9   better word, let's call it a "posting."
10     Did you indeed post that?
11 A  I did indeed.
12 Q  You did.  And whose wall did you post this on?
13 A  A gentleman by the name of Andrew Auernheimer.
14 Q  Would you spell that for the court reporter, if
15   you know.
16 A  I do not know.
17     MS. MACCHIA:  I have it for you.  It's
18   A-U-E-R-N-H-E-I-M-E-R.
19     (A discussion was held off the record.)
20 BY MS. MACCHIA:
21 Q  And was this in response to another posting or a
22   comment?
23 A  This was part of an ongoing, I guess you would
24   call it, argument that I was having with Bagha.
25 Q  So no personal tie to Bagha?  Just happened to

**22**

1   see his posting on Andrew's wall?
2 A  Can't say for certain how we came to cross paths
3   on the Internet, but I certainly have never seen
4   this person in real life.
5 Q  Do you have any idea how he would have known
6   that you were a student at IU?
7 A  I have a working theory.
8 Q  What's that?
9 A  It's purely speculation on my part.
10 Q  Sure.  Sure.
11 A  I have a very unusual name.  So my assumption is
12   that he typed into Google, and one of the first
13   things that popped up was probably the Indiana
14   University Media website, Media Department's
15   website, and I'm listed as a grad student there.
16 Q  I see.  So grad students are listed on the IU
17   website?
18 A  I believe Ph.D. students are.
19 Q  Then the one that's not blown up, but it's like
20   two down, that has your name next to it, did you
21   also post that?
22 A  Do not recall.
23 Q  Is there any reason to believe you did not, and
24   somebody else posted this with your name?
25 A  Can you rephrase that question, please.

**23**

1 Q  Sure.
2     Is there any reason to believe that the
3   posting next to your name would have been posted
4   by somebody else?
5 A  Well, if you're asking if someone else has
6   access to my account?
7 Q  Sure.
8 A  No.  No one else has access to my account.
9 Q  So is it safe to say if there's a posting next
10   to your name, that would have been -- that would
11   have came from your account?
12 A  I don't believe so.  No.
13 Q  Why is that?
14 A  These are screenshots.  They could have easily
15   been altered.
16 Q  Do you remember posting any of the ones on the
17   next page?
18 A  I do not, no.
19 Q  How about the next page?  There's one at the
20   top.
21 A  Do not recall.  No.
22 Q  So you don't remember.  You're not saying "yes"
23   or "no"; right?
24 A  I do not remember.  No.
25 Q  Okay.  I just wanted to make sure you weren't

**24**

1   saying, "No, I didn't do it," or, "Yes, I did."
2     Did you engage in arguments like this on
3   Facebook often?
4 A  What do you mean by "arguments like this"?
5 Q  Would you engage in -- so I would describe --
6     How would you describe this argument?  Like
7   would you describe it as "heated"? "aggressive"?
8   anything like that?
9 A  This first block of text in the second page
10   you're speaking of?
11 Q  Yes.
12 A  What exactly's the question?
13 Q  How would you describe --
14     So what I'm trying to --
15     And maybe you can kind of help me here.
16   I'm trying to figure out if this was just a
17   one-off, like you just got set off by something
18   that was said, or if there's been other
19   instances where it's the same kind of thing
20   where you've been set up by where something's
21   said politically or otherwise?
22 A  I would say that this is not typical of my
23   behavior on the Internet.
24 Q  That first posting, then, that we're talking
25   about, do you think that that's an appropriate



25

1    posting on social media?
2 A  I'm not really one to make that decision.
3 Q  Do you feel that IU, or any other school, would
4    have a reason or the right to discipline either
5    a student or employee for making such a posting?
6 A  Would you rephrase that question for me, please.
7 Q  Sure.
8        Would any university have a reasonable
9    reason to discipline either a student or an
10    employee for writing this post?
11        MR. MEISENHELDER:  For the record, are you
12    talking about a public university or a private
13    university?
14        MS. MACCHIA:  We'll say public, a
15    university like IU.
16 A  In my opinion?  No.
17 BY MS. MACCHIA:
18 Q  Why is that?
19 A  As a public institution, they certainly have no
20    right whatsoever to sort of regulate speech.
21 Q  Do you think there's any line that a student or
22    employee could cross in terms of speech?
23 A  If it violates established free speech
24    jurisprudence.  There are limits certainly, but
25    those are well defined.

26

1 Q  Do you know what types of speech that would be?
2 A  Direct calls for violence, as would be, you
3    know, under -- was it Brandenburg v. Ohio that
4    meet that qualification?  I believe also
5    something like selling of state secrets would
6    not be permitted speech.
7 Q  So as long as it doesn't rise to the level of
8    being like terrorism or a direct threat calling
9    for violence, would you say that there's no
10    other types of speech that a university could
11    regulate?
12 A  Not a public one.  No.
13 Q  How about hate speech?
14 A  There's legally no such thing.
15 Q  How about racist speech?
16 A  That is protected speech.
17 Q  Do you know if IU has a policy about social
18    media use for its employees?
19 A  I do not, no.
20 Q  I know you said that this post in Exhibit 1 was
21    made on Andrew's Facebook wall; is that right?
22 A  Mm-hmm.
23 Q  Have you ever posted directly on Bagha's wall?
24 A  No, I've never.  I couldn't anyway.  We're not
25    connected.

27

1    We're not connected.
2 Q  And is his profile not public?
3 A  I don't recall, but I don't believe so.
4        (A discussion was held off the record.)
5 Q  Do you know what IU did after receiving
6    Exhibit 1? the email in Exhibit 1?
7 A  There's -- not really.  There's a good chunk of
8    time that's unaccounted for.
9 Q  That would have been until August when you found
10    out about everything?
11 A  Correct.
12        Yes.  I have no idea what happened between,
13    I think it was May 20th and mid to late August
14    of 2016.
15 Q  Do you know if the email in Exhibit 1 was sent
16    to the IU police department?
17 A  I have no knowledge of anything going to or from
18    the IU police department at all.
19 Q  No one ever told you that?
20 A  The dean mentioned that he had brought this to
21    the attention of the IU police, but I have no
22    idea what he sent them or what their response
23    was or anything.  But they never contacted me, I
24    can tell you that.
25 Q  So it's safe to say you don't know what came of

28

1    that? if there was an investigation or anything
2    like that?
3 A  If there was, I was unaware of anything.
4 Q  Okay.  How did you find out about everything in
5    August of 2016?
6 A  That is a long process, to be honest.  It was
7    disclosed in phases.
8 Q  Do you mind going through it?
9 A  Not at all.  Let's see.  Initially, sort of a
10    vague insinuation was brought to my attention by
11    Andrew Weaver, who was the director of graduate
12    studies at the time.
13        He said that -- I'm paraphrasing here, but
14    it's pretty close to what he said -- "There were
15    problematic issues with your social media
16    account," and that's all he really said.
17        And that was all I really had in terms of
18    information until early September of that year,
19    so about two or three weeks later.  And it was
20    not until that period of time that I saw this
21    sequence of emails and it was brought to my
22    attention the Office of Student Ethics was
23    handling this.
24 Q  Did someone meet with you that time in
25    September, or was this email traffic?



29

1  A   I was visiting my family in New Jersey at the
2     time, so all information prior to my returning
3     to Bloomington was conducted by email.  Yes.
4  Q   When Andrew Weaver contacted you via email, was
5     that with respect to your teaching or research
6     assistant role, or was that separate?
7  A   To the best of my recollection, I had emailed
8     him over the summer asking about orientation.
9     Because when I was a new student, they had
10    existing students sort of, I guess, volunteer
11    to, you know, sit on panels and talk about what
12    the program was like and so on.  I was
13    interested in that so I emailed him.  I don't
14    believe he ever got back to me.
15       But maybe a month or two later is when I
16    noticed that the other Ph.D. students that I was
17    friends with on Facebook were posting about
18    their assignments for the upcoming semester, and
19    I never got one.  So I emailed Weaver asking him
20    had they all been made yet or something along
21    those lines, and that's when he responded with
22    his problematic comment.
23 Q   So at that time, you don't remember him giving
24    you an SAA assignment?
25 A   He said I would have an SAA assignment for the

30

1     fall semester, but I believe that's all he said.
2  Q   And did you meet with him in person at any
3     point?
4  A   Later down the line I did.  Yes.
5  Q   Was that with the dean at the time?
6  A   Yes, with the dean.
7  Q   What was the dean's name?
8  A   James Shanahan.
9  Q   Was anyone else present during that meeting that
10    you can remember?
11 A   No, just the three of us.
12 Q   Was that September 12 or 13-ish?
13 A   It sounds about right.  It was mid September.
14 Q   I think I have something in here that says the
15    date, so we'll get to it.
16       Was that meeting in one of their offices?
17 A   That was in Dean Shanahan's office.  It was
18    initially scheduled for Weaver's office,
19    however, though.
20 Q   Okay.  Were you originally supposed to only meet
21    with Dr. Weaver?
22 A   I was originally only to meet with Weaver.
23 Q   Is he a "Dr. Weaver" or do you know?
24 A   I believe the term "doctor" can be used with
25    someone with a Ph.D --

31

1  Q   Okay.  Professor.
2  A   -- but "doctor" or "professor," yes.
3  Q   Okay.  I never know how to refer to people.
4     All right.  Can you describe, to the best
5     of your recollection, what was discussed during
6     that meeting?
7  A   Let me see here.  I should probably say that --
8     I really don't --
9        That's a bit of a complicated question.
10    Would you mind breaking that up into smaller
11    bits?
12 Q   Sure.  I can do that.  Actually, I'm going to
13    ask you a different question, first, that I just
14    thought of.
15 A   Okay.
16 Q   Did you know your SAA position for that semester
17    by the time you met with Professor Weaver and
18    the dean?
19 A   I believe so, yes.
20 Q   So during this September meeting, was the email
21    in Exhibit 1 shown to you?
22 A   I can't say for certain.  Do not recall, really.
23 Q   Was the substance of the Facebook posting
24    discussed with you?
25 A   The first block on the second page of this

32

1     document, that was presented to me.  Yes.
2  Q   And were you asked whether you had posted that?
3     How did that conversation go?
4  A   I believe that, yes, the dean did ask me that.
5  Q   Did you say "yes"?
6  A   To the best of my recollection, I said that I
7     defer to my testimony I gave at the Office of
8     Student Ethics.
9  Q   And do you remember when that was?  Was that in
10    August?
11 A   That would have been very early September,
12    possibly very late August, but around that time.
13 Q   Do you remember who you met with at the Office
14    of Student Ethics?
15 A   A woman by the name of Elizabeth Spotts.
16 Q   Was she the only one person?
17 A   No.  There was a note-taker.  I don't recall his
18    name though.
19 Q   I kind of jumped around a bit.  Let's talk about
20    that meeting for a minute.
21       Did you present -- let me back up.
22       Did you have notice of that meeting to be
23    able to get ready for it?
24 A   I would characterize the period of time as
25    unreasonably brief, but I was given a notice



33

1    that fit that description, I would say.
2 Q   Did you request extra time?
3 A   I did, yes.
4 Q   Was that granted?
5 A   A further, unreasonably brief period of time was
6      given to me.  Yes.
7 Q   Did you also request some information prior to
8      meeting with the Office of Student Ethics?  To
9      review files or anything?
10 A   There's a process for that the university has in
11     place that's a procedural thing.  So I did
12     request to see and to have copies of certain
13     things, but it wasn't necessarily granted to me.
14 Q   Were you allowed to see the files or the
15     documents?
16 A   I was allowed to view them under very limited
17     circumstances.
18 Q   What circumstances would those have been?
19 A   I had to give the Office of Student Ethics a
20     24-hour minimum notice.  I was allowed to view
21     printed-out copies of anything they had.
22         I was not allowed to take anything, even
23     paper copies.  I was not allowed to photograph
24     these things.  I was not allowed to videotape
25     these things.  I was not allowed to speak them

34

1    into a voice recorder.
2        I was allowed to have, really, no
3    documentation other than I was allowed to view
4    them in a controlled environment with someone
5    observing me to make sure I wasn't doing any of
6    those things.  That was the extent of what I was
7    allowed to have.
8        (Deposition Exhibit 2 was marked for
9    identification.)
10 Q   You've just been handed what's been marked as
11     Exhibit 2.  My first question will be, after
12     you're done looking at it, whether you recognize
13     this document.
14 A   I can't say whether I recall it directly but
15     perhaps.
16 Q   Okay.  Does it look like the notice that you
17     would have been provided from the Office of
18     Student Ethics?
19 A   It does, yes.
20 Q   Do you remember what you did after receiving
21     this notice in Exhibit 2?
22 A   Not specifically, but I did ask for more time
23     because I believe I was still in New Jersey on
24     August 23 of 2016.
25 Q   You said you were still in New Jersey on

35

1      August 23?
2 A   I believe I said I was.  Yes.
3 Q   And that was the date in the notice that she had
4      put as the hearing date or meeting date?
5 A   Correct.  Yes.
6 Q   Do you remember when the -- do you call it a
7      "hearing" or a "meeting"?
8 A   I don't know exactly what term they use.  It is
9      presented as some sort of legal hearing, but it
10     doesn't have that kind of weight or binding
11     anything whatsoever.  They even phrase it here
12     as a "conduct hearing."
13 Q   If I call it a "hearing," that's okay with you?
14 A   That's fine with me.
15 Q   Okay.
16 A   Yes.
17 Q   Do you remember when the hearing was ultimately
18     scheduled or when it ultimately took place?
19 A   Not long after August 23 -- I don't recall the
20     exact date -- but perhaps a week or so.
21 Q   Would September 1st be correct, maybe?
22 A   That sounds reasonable.  I believe so.  Yes.
23 Q   And you were talking about, before, how you had
24     to give 24 hours to view certain documents and
25     go through all these different steps.

36

1        Did you ultimately do that and review
2    documents before the hearing date?
3 A   Yes, I did.
4 Q   Do you remember what kinds of documents you
5      reviewed?
6 A   To the best of my recollection, it was nothing
7      more, really, than what I was given in Exhibit 1
8      right here.
9 Q   So based on the notice provided in Exhibit 2 and
10     the email in Exhibit 1, did you feel that you
11     had adequate notice to be able to present
12     yourself during that hearing?
13 A   No, I did not.  No.
14 Q   What else do you think you would have needed?
15 A   Well, I would have liked to have had a lawyer
16     present.
17 Q   Were you able to?  Is that allowed in that
18     process?
19 A   Under certain circumstances, yes, a lawyer is
20     allowed to be present, but they cannot act as a
21     lawyer at all.
22 Q   Did you request to have a lawyer?  Or why didn't
23     you?
24 A   I could not afford one.
25 Q   Elizabeth Spotts, did she have a lawyer with her



37

1    at all?
2  A   She did not.  No.
3  Q   Anything else you feel like you needed to
4      adequately defend yourself or present yourself
5      in that hearing?
6  A   I guess more context.  And the document in
7      Exhibit 1 does not seem to be complete, in my
8      opinion.  There seems to be --
9          There seems to be a segment of a longer
10     email chain.  I would have liked to have seen
11     that.  I would have liked to have known more
12     context.  I would have liked to have known what
13     happened between May 20 and that period of time,
14     early September.
15 Q   When you say "more context," what do you mean by
16     that?
17 A   Just, really, anything.  I was kind of just
18     given the document in Exhibit 1 and nothing
19     else, really.  I was given no explanation as to
20     what I'd really done wrong, what the
21     circumstances of this were, really anything.  It
22     was just a manila envelope with Exhibit 1 inside
23     of it, and that was it.
24 Q   So then you ultimately attended this hearing
25     with Elizabeth Spotts on or about September 1st,

38

1      2016; is that right?
2  A   Correct.
3  Q   Did you call witnesses or anything during that?
4  A   I did indeed.
5  Q   Who was that?
6  A   Andrew Auernheimer.
7  Q   Does he live in town?
8  A   I don't know exactly where he lives.
9  Q   Were you friends with him or how did you come
10     across him?
11 A   I would say he's a bit of a public figure.
12 Q   And you were Facebook friends?
13 A   I was -- I believe, to the best of my
14     recollection, yes, I was Facebook friends with
15     him.
16 Q   Is he a public figure that you just had the same
17     views with, or is it something different?  I
18     guess what I'm trying -- I want to know how you
19     guys got connected to begin with.
20 A   Well, I guess as a minor celebrity of sorts,
21     he's come into knowledge of these people that
22     kind of way.  Really, nothing more than that.
23 Q   Did you reach out to him to ask if he would be a
24     witness for you during this hearing?
25 A   Yes, I did.

39

1  Q   And he agreed?
2  A   He agreed.
3  Q   Did you do this via Skype?
4  A   Via Skype.  Yes.
5  Q   Why did you select him as a witness?
6  A   I'd completely forgotten who Mohammed Bahga was
7      or that I had any interaction with him.  So I
8      looked at his -- I searched for his name on
9      Facebook.  Although his profile was private, I
10     believe, it does --
11         Facebook says you have a certain number of
12     mutual friends, and we had one mutual friend:
13     Andrew Auernheimer.  So I thought Auernheimer
14     must know something about him.  That's why I
15     asked him.
16 Q   Did you talk to him about that before the actual
17     hearing?
18 A   I asked him -- let's see.  I had asked him who
19     Bahga was, and he told me who he was.  Then I
20     said, "Would you be willing to say this in a
21     hearing I have regarding him?"  He agreed.
22 Q   Do you remember how you described Bahga?
23 A   Well, Bahga describes himself in the email as,
24     among other things, a peaceful Sufi, an educator
25     of Islam, someone who fights bigotry and that

40

1      kind of thing.
2          I asked Auernheimer if this was true, and
3      he said, "No, not at all."  Bahga is a Salafist.
4      Bahga works for the Saudi government in an
5      intelligence-gathering capacity in order to
6      imprison political and religious dissidents.  To
7      characterize himself -- that he characterized
8      himself as some kind of educator of Islam was
9      patently ridiculous.
10         So having learned that about Bahga, I
11     figured that that would be worthy to bring to
12     the Office of Student Ethics.
13 Q   Do you know if Bahga or did Andrew say whether
14     he lived in the Middle East or if he lives in
15     the States or somewhere else?
16 A   Bahga's Facebook page lists him as living in
17     some city in Saudi Arabia.  I don't remember the
18     name.  It was not Riyadh, I can tell you that.
19     And Auernheimer confirms that Bahga lived in
20     Saudi Arabia.
21 Q   Do you know if Andrew and Bahga had any
22     relationship beyond Facebook?
23 A   I can't really say.
24 Q   Were there any other witnesses called by the
25     university or anything during that time?



45

1 Q   In that same paragraph, it says that "the
2    statements were not a credible threat and he" --
3    meaning you -- "was trying to get Bahga to 'shut
4    up.'"  Is that accurate?
5 A   More or less.
6 Q   Then did you also say that it is not indicative
7    of your normal behavior on social media?
8 A   Is that stated anywhere in this document?
9 Q   Yes.  I think it's in the same --
10       We can use the separate one.  It says that
11    you stated that "people don't act the same in
12    real life as on the internet."
13       Is that -- do you remember saying that?
14 A   Not directly, no.
15 Q   Do you know that?
16 A   I would agree with that, yes.
17 Q   All right.  Next page.  So it's 66 at the
18    bottom.  The first full paragraph she's asking
19    or summarizing the conversation that you guys
20    had about the "shitskin children" part of the
21    comment.  If you read those couple sentences,
22    does that accurately describe what you remember
23    taking place during the hearing?
24 A   I would say no.
25 Q   How would you describe what actually happened

46

1    then?
2 A   I recall Spotts asking me this question.
3 Q   Mm-hmm.
4 A   My response was --
5       She had asked me, you know, "Why would you
6    say that?"  And I said something along the lines
7    of, "It resembled shit."  She asked me to
8    clarify that.  I believe I posed the question to
9    her, "Would you consider shit to be good
10    looking?" or something along those lines.
11 Q   So had you seen his children before?  Did you
12    know?  Or was this just a comment?
13 A   I don't think I'd ever seen his children before.
14    That, at best, was an off-the-cuff comment.
15 Q   The next one, last page, 67.  It's the sentence
16    before the bolded part that says "Decision."
17 A   Mm-hmm.
18 Q   It says that -- let's see -- you stated "Do I
19    regret what I said, yea -- I probably could have
20    used better terms."
21       Did you say that?
22 A   Umm --
23 Q   Is that accurate?
24 A   Within the context of the first quote on the
25    second page of Exhibit 1, I did say something to

47

1    that effect, yes.
2 Q   Why did you say that you regret what you said?
3 A   It was mean-spirited, and it's not something
4    that you would normally say to somebody.
5 Q   Would you consider yourself as typically a mean
6    person?
7 A   Not at all.  No.
8 Q   Do you know what the decision was, made after
9    this hearing?
10 A   Yes.  I believe it was in -- it's stated in
11    Exhibit 3 -- that I was found not responsible
12    for the first two, but I was found responsible
13    for the third.  It's in the middle of page 67.
14 Q   Did you agree with that finding? that you were
15    responsible for the personal misconduct not on
16    university property?
17 A   That's a bit of a loaded question.  Can you
18    rephrase it.
19 Q   Was it reasonable?
20 A   Absolutely not.
21 Q   Why?
22 A   If you read Part 1 [sic], "Personal Misconduct
23    Not on University Property/I2b," or whatever
24    that provision is, if you read it, that covers
25    explicitly criminal acts that happen off campus.

48

1    So things like off-campus rapes, off-campus
2    robberies, and that kind of thing.
3       I don't believe that that provision in the
4    Student Guide Book, or wherever it appears, can
5    be applied to noncriminal acts, and it certainly
6    cannot be applied to personal behavior on one's
7    own free time, in one's own apartment, and using
8    one's own Internet connection.
9 Q   Do you know of any other student that has been
10    found responsible for that same provision,
11    "Personal Misconduct Not on University
12    Property," for a noncriminal act?
13 A   I have no idea.  That's something you would have
14    to ask Ms. Spotts about.
15 Q   It says that the recommended step would be a
16    "deferred suspension - 1 year."
17 A   Mm-hmm.
18 Q   What is a deferred suspension?
19 A   To the best of my knowledge, Spotts explained
20    this to me because I didn't know what it was and
21    I asked her.  And as I recall, it is if I'm
22    found guilty again of violating whatever
23    provision the Office of Student Ethics oversees,
24    that whatever punishment I would be given, on
25    top of that would be a one-year suspension as a



49

1    student.
2  Q  I see.  So to actually be suspended, you would
3      have to violate another provision or the same
4      provision again?
5  A   Correct.  I would have to be found guilty of
6      violating something else, and if so, I would be
7      given that punishment as well as a deferred
8      suspension, a one-year suspension as well.
9  Q   And is there a way to appeal this decision?
10 A   There is indeed.  Yes.
11 Q   Did you?
12 A   I did not.
13 Q   And do you remember why you chose not to?
14 A   I saw it was essentially a nonpunishment.  I had
15     no intentions of violating the student handbook
16     or whatever rules and guidelines the OSE
17     oversees.  I had no intention of violating it
18     again.  I thought it was not worth my time, and
19     I thought I would simply wait the year out and
20     be fine.
21 Q   And then also under "Recommended Action Steps,"
22     it says "Wellness Pillar:  Continued Sessions
23     With Counselor (minimum of 2 sessions)"?
24 A   Yes.
25 Q   Do you know why she wanted you to continue

50

1    sessions with a counselor?
2  A   I had mentioned -- I believe, to the best of my
3      knowledge, I had mentioned in our hearing that I
4      was seeing a university therapist at the time.
5      And Spotts may have asked if that was helpful
6      for me, and I said yes.  She said, you know, to
7      keep it as part of the recommended action steps.
8      But I was planning on seeing him anyway.
9  Q   So it's just another kind of nonfactor?
10 A   Right.  Yeah.  I liked seeing my therapist.  It
11     was not something that I even saw as a
12     punishment.  I said, "Well, I'm planning on
13     doing that anyway."
14 Q   At this time, do you remember how often you were
15     seeing the therapist?
16 A   I would say a couple of times a month, maybe
17     every two weeks or something like that.
18 Q   Were you doing that a couple times a month
19     throughout the entire time you were at IU?
20 A   No.  I believe I started in my second semester.
21 Q   Okay.  So that would have been spring 2016?
22 A   Correct.  Yes.
23 Q   Is this a therapist or counselor that works at
24     IU or outside?
25 A   At IU.  They have an in-house -- I think it's

51

1    called "Counseling and Psychological Services."
2    It was part of that.
3  Q   Is it just for students?
4  A   I believe faculty also had access to it, but
5      yes, for IU, the IU community.
6  Q   Okay.  Do you have to pay for sessions or how
7      was that?  Do you know how that works?
8  A   To the best of my recollection, it is a very
9      small co-pay.  It's covered mostly by the
10     IU Health insurance.  Maybe $5 a visit or
11     something like that.  I don't know the exact
12     figure offhand.
13 Q   So then this decision by the Office of Student
14     Ethics, that's completely separate from anything
15     that happened with your SAA position; is that
16     right?
17 A   That's correct.  I thought this was the end of
18     it, really.
19        (Deposition Exhibit 4 was marked for
20     identification.)
21 Q   After you have a chance to look at it, I'm just
22     going to ask if you remember receiving this
23     document.
24 A   I do recall receiving this document or one
25     similar to it.

52

1  Q   Then at the bottom, it says, "No. 3, Reflective
2      Pillar - Closure Meeting."
3         Did you have a closure meeting that you
4      remember?
5  A   I did indeed have a closure meeting with
6      Elizabeth Spotts.
7  Q   Do you remember about when that occurred?
8  A   It certainly occurred prior to the completion
9      date specified here.  It happened prior to
10     October 28, 2016, but I don't recall the exact
11     day.
12 Q   Do you remember if it would have been before
13     your mid-September meeting with the dean and
14     Professor Weaver?
15 A   I don't recall, but it probably would have
16     happened around the same time, I think.
17 Q   Do you remember what you and Ms. Spotts talked
18     about during that meeting?
19 A   Bits and pieces.  Yeah.  Not the entire meeting,
20     really.
21 Q   What do you remember from that meeting?
22 A   I remember -- let's see.
23        One question that certainly stands out in
24     my mind at this point, I think -- actually
25     this -- now that I think about it, the closure



53

1   meeting with Spotts happened after the meeting
2   with Weaver and Dean Shanahan.
3       So I don't recall the exact date, but
4   sometime after that meeting and before
5   October 28 is when I met with Spotts.  This is
6   already when the dean had made insinuations at
7   the very least that I would be terminated.  I
8   asked Spotts, "Do you think I deserve to be
9   homeless?"  And she said, "We do not involve
10  ourselves in labor matters."
11 Q  And that's because the issue with your SAA
12     position was looked at as more of an employment
13     matter rather than an academic matter?
14 A  Correct.  The dean, in his meeting with me, was
15     explicit on that.  He said that OSE only has,
16     you know, authority over me as a student, but he
17     has authority over me as an employee.  So he
18     thought it upon himself that he could exercise
19     further action against me beyond what OSE would
20     have done.
21 Q  In that closure meeting, was it just you and
22     Ms. Spotts, or was the note-taker there again?
23 A  There was no note-taker.  It was just me and
24     Spotts.
25

54

1       (Deposition Exhibit 5 was marked for
2   identification.)
3 Q  I'll give you a minute to look over this.
4 A  Okay.
5 Q  Do you remember this email string?
6 A  Yes, I do.
7 Q  All right.  So let's start at the bottom.  It
8     looks like Professor Weaver's email to you on
9     August 23 of 2016.
10      It says that "Linda mentioned to me that
11     you were asking about the status of your
12     grievance."
13      What grievance were you referring to?
14 A  Because I felt that this could be resolved
15     through the official university process, there
16     is I believe what is known as a D25 grievance
17     somewhere in the annals of the school processes
18     and stuff.
19      And this is a grievance that a -- I believe
20     a professor or an SAA, perhaps just an SAA, can
21     bring about to their department for labor
22     issues.  And I felt that was appropriate to
23     bring at the time.  So I asked, "How do I do
24     this?"  I knew it existed, but I didn't know the
25     process by which to file this grievance.

55

1       So Linda is one of the department
2   secretaries, the graduate secretaries.  I'd
3   asked her if she knew how I'd do this, how I'd
4   go about doing it.
5 Q  So at this time, were you told that you were not
6     going to be or have an SAA position, or what
7     exactly was the action you were grieving or
8     wanted to grieve?
9 A  That I was denied a teaching appointment.
10 Q  I see.  So that it was a research role rather
11     than a teaching role?
12 A  Correct.  But I viewed it as a disciplinary act
13     against me, so that's why I wanted to file a
14     grievance.  I never actually did.
15 Q  Why didn't you do that?
16 A  Because as you see in the email I sent to
17     Weaver, I asked him if we could discuss this
18     outside of the official grievance channels.
19 Q  And did you ultimately discuss it outside of the
20     grievance channels?
21 A  No.
22 Q  Could you have still filed a grievance if you
23     wanted to?
24 A  I believe that was no longer an option after the
25     dean decided to terminate me.

56

1 Q  Do you remember if Professor Weaver ever
2     responded to your email here?
3 A  To the best of my knowledge, this email chain
4     eventually led to scheduling a meeting with him,
5     that less than 12 hours beforehand, he emailed
6     me saying that the venue was going to be changed
7     and that it would involve Dean Shanahan.
8       Because initially, Weaver agreed to meet
9     with me in his office one on one.  And then,
10     like I said, about 12 hours before the meeting,
11     he emails me again and says, "Well, the dean
12     would like to sit in," I believe his exact
13     phrasing was, "so he could help answer some
14     questions," and it would be moved to the dean's
15     office.
16 Q  I see.  So at the time the meeting was scheduled
17     with Professor Weaver, did you think that was
18     going to be your informal discussion to resolve
19     this grievance that you would have had?
20 A  Yes.
21 Q  All right.  So then you ultimately met with
22     Andrew Weaver and Dean Shanahan on September 12
23     or 13; does that sound right?
24 A  Sounds about right.  Yes.
25 Q  Did you tape-record this meeting?



57

1  A   Yes, I did.
2  Q   Why did you decide to do that?
3  A   Although I walked into the meeting thinking,
4     honestly, that I would get an apology, because I
5     had no idea of the dean's involvement in this at
6     all whatsoever.  All the communication was given
7     to me by Weaver.
8        I thought that it was a bit suspicious and
9     that I should probably just hedge my bets and
10    record the meeting.
11 Q   Did you just do that with your cell phone?
12 A   Yes.
13 Q   And do you know if you provided a copy of that
14    in this litigation during discovery?
15 A   I did indeed provide a link to that in the
16    discovery documents.
17 Q   Had you had any involvement with Dean Shanahan
18    prior to this meeting?
19 A   Not officially, no.
20 Q   Had you had any informal conversations or
21    anything like that?
22 A   As I recall, he spoke to the inaugural class.
23    It was a small group of us, maybe 20 students or
24    so.
25       So he spoke to us during orientation.  And

58

1     I think it was the first week of classes of the
2     fall 2015 semester, he came to the Media 101
3     class that I was assigned to, and he talked to
4     that whole 1200-student class.  And afterwards,
5     he, I, and the professor who was teaching that
6     class, strolled back to one of The Media School
7     buildings together and maybe chitchatted.  That
8     was about it.
9  Q   Okay.  So no formal dealings before?
10 A   No.
11 Q   This is kind of off track, but were you
12    evaluated as an SAA?
13 A   I indeed was.
14 Q   Was it student evaluations or professor
15    evaluations or both?
16 A   It was both.
17 Q   And did you read (phonetic) for each of those?
18 A   Yes, I was.
19 Q   How were your evaluations?
20 A   My professor evaluations were great.  I think I
21    got the highest marks possible on all of those,
22    and I got good feedback from them.  So it was
23    aside to just verbally and informally, "You're
24    doing a good job, I really appreciate your
25    help," so on and so forth.

59

1        Students' evaluations were favorable as
2     well.  Both on the record, whatever -- at the
3     end of the semester, they hand out little
4     Scantron sheets.  You fill out like 1 to 5 "How
5     was he doing at this or that?" whatever it is.
6     Those were all favorable.  My comments were
7     favorable.
8        And just in general, students would come up
9     to me and say, "I love taking this class with
10    you."  I heard from the other teaching students
11    assigned to that class, the C-101 class -- there
12    were four of us.  One of them said that he had
13    heard through a friend of his who was in one of
14    my classes that I was so good, they actually
15    wanted to transfer, see if they could transfer
16    to my section.  So I was well liked.
17 Q   Were you evaluated for the research role that
18    you had in fall of 2016?  Do you remember?
19 A   That, I don't remember.
20 Q   Okay.  So then during this meeting with Dean
21    Shanahan and Professor Weaver, were you
22    presented that Exhibit 1 email again?
23 A   I believe it was not the entire email chain or
24    the entirety of documents of Exhibit 1.  I
25    think, really, just printouts of certainly the

60

1     first page -- the second page screenshot, but I
2     don't recall if it was all the rest of them as
3     well.  It might have been just that one.
4  Q   Okay.  How did this meeting start?  Did the dean
5     kind of present, "This is why we're here"?  Or
6     did Dr. Weaver do that?
7  A   Neither of them really presented why both of
8     them were there.  It just sort of started out
9     with the dean talking about how Office of
10    Student Ethics handles student status problems,
11    but that he has the authority to decide
12    employment issues.  That's how the meeting
13    started, really.
14 Q   So then during the meeting, did he give you any
15    indication that you could be disciplined on the
16    employment side?
17 A   He explicitly said that I could be fired, yes.
18 Q   Did he specifically say it was for that one
19    posting? that top post in Exhibit 1 on page 2?
20 A   Something to that effect.  Yes.  That was -- he
21    said something to the effect that he found it so
22    shocking, or something like that, that he would
23    contemplate terminating me.
24 Q   Did you respond in any way?  Did you try and
25    explain where you were coming from with making



61

1    that posting or anything like that?
2  A   No.  I simply deferred -- any direct questions
3     about that I deferred to my testimony at Office
4     of Student Ethics.  But he did ask me to sort of
5     justify keeping my job on the spot in this
6     meeting.  I told him that he can consult my
7     evaluations, both student and faculty.  He can
8     even ask around the faculty.  I gave him the
9     name of about five or six faculty members who
10    knew me well -- I felt knew me well enough to
11    give him an accurate assessment of who I was and
12    that he should talk to them.
13 Q   Do you know if he did talk to them?
14 A   I know for a fact he did not talk to at least
15    two of them.  He did not talk to Stephanie
16    DeBoer, and he did not talk to Joshua Malitsky.
17       Those are at least two of the names I told
18    him to consult.  Because Stephanie DeBoer was
19    the chair of my advisory committee, and she
20    probably knew me the best of anybody.  And
21    Joshua Malitsky, I had a very good relationship
22    with, and he was a member of my advisory
23    committee.  I asked them weeks later, "Has the
24    dean spoken to you about me?"  And they both
25    said no.

62

1  Q   The other three faculty members you did not ask?
2  A   I did not ask, no.  I don't believe so.
3  Q   What's an advisory committee?
4  A   Sure.  It's a panel of about, I think, three or
5     four -- I forget the exact number -- of faculty
6     members, full-time, you know, tenured or
7     tenure-track faculty members whom advise you in
8     your status as a Ph.D. student --
9        You're a Ph.D. student, first, and then
10    you're a Ph.D. candidate.  The differentiation
11    there is whether or not you're done with
12    coursework and qualifying exams.
13       So the advisory community steers you
14    through the coursework and comes up with exam
15    questions for your qualifying exam.  They would
16    say, "If you took this class, you're going to
17    need to have read that book," that kind of
18    thing.
19       They have a good knowledge of your research
20    and academic interests and so on, and they sort
21    of guide you through that process.  After you
22    advance to candidacy, you select a new
23    committee.  But it's usually the same people
24    anyway, and they steer you through your
25    dissertation.

63

1  Q   And this is sort of a background Ph.D. question:
2     When you're in that program, do you take classes
3     for a certain amount of time, and then you have
4     time to do your dissertation, or is it all
5     combined together?
6  A   It's separated.  Initially, you have to meet the
7     credit requirements.  I forgot what they are
8     offhand.  But you have to take this many
9     credits' worth of course work.  Once you're done
10    with course work, then there's a sort of
11    in-between period which is the qualifying exam
12    period.  That usually lasts a semester.  And
13    then after you pass or fail your exams,
14    depending on what happens there, then you
15    advance to candidacy and you work just on your
16    dissertation.
17 Q   Had you decided at this point what your
18    dissertation was going to be about, or was it
19    too early?
20 A   It was a bit early.  I knew the methodology and
21    the field, but I did not know the exact topic.
22 Q   Do you remember any other specific conversation
23    or comments made during this meeting with Dean
24    Shanahan and Professor Weaver?
25 A   Let's see.  Can you be more specific.

64

1  Q   I mean, so other than them showing you the
2     posting and having you justify your job or
3     keeping your job, is there anything else that
4     sticks out in your mind when you left that
5     meeting?
6  A   Yes.  This may not be all, but certainly
7     something that sticks out in my mind.  Earlier
8     in our exchanges, I think it was probably still
9     in August, Weaver had mentioned that the dean of
10    students would have liked to have met with me.
11    I don't know who this person is by name.  I just
12    know their title, the Dean of Students.
13       The phrasing was the dean of students
14    requested to meet with me.  I was in New Jersey
15    at the time, so I couldn't have anyway.  And I
16    didn't understand why the dean of students
17    wanted to meet with me.  In that meeting, at the
18    very end I asked Weaver, you know, "What was
19    that thing with the dean of students?  Why did
20    the dean of students want to meet me, and what
21    would be the nature of that meeting?"  And he
22    responded that would be pretty much exactly the
23    same as the meeting I had with the dean.  So
24    being confronted by documents that I'd never
25    seen before, being asked to justify myself



---

65

1    without any sort of preparation.  That's what I
2    interpreted that to mean.
3  Q   But you had seen the email before -- is that
4    right? -- or at least that top posting?
5  A   I'd seen it in the OSE hearing, but at the time
6    I had not seen it.  When Weaver informed me that
7    the dean of students wanted to meet with me, I
8    had not seen any of these things.
9  Q   I see.  Okay.  So that would have been earlier
10   in the August time frame?
11 A   Right.  I did not see Exhibit 1 until I'd
12   already gotten back to Bloomington, which would
13   have been very, very late August, very, very
14   early September.  So by mid August, when Weaver
15   said the dean of students said he wanted to meet
16   with me, I had no idea of anything going on:
17   Who was accusing, what I'm being accused of,
18   what evidence exists, so on and so forth.
19 Q   When Professor Weaver told you that the dean of
20   students wanted to meet with you, did you
21   respond saying that you would once you got back
22   to Bloomington?  Do you remember how that
23   exchange ended?
24 A   No.  I don't remember exactly what my response
25   was, but I did turn over -- I believe I did turn

---

66

1    over that email exchange in the discovery, so
2    that's in there somewhere.
3  Q   Okay.  And so then this meeting, how did it end?
4  A   The dean said that he would -- he agreed to look
5    at my student evaluations, my faculty
6    evaluations, and he would agree to consult the
7    professors I named.  He said he would do that.
8    He would take a week or two, and he would make a
9    decision then.  That's what he said.
10 Q   Was it your understanding that this decision was
11   whether or not you would keep your SAA position?
12 A   Yes.  It was whether or not I would be
13   terminated.
14 Q   So we've been going for about an hour and twenty
15   minutes.  Do you want to take a short break?
16 A   I'm okay.
17 Q   You're okay?
18       After this meeting, did you speak
19   individually with Professor Weaver?
20 A   Yes, but not about anything in the meeting.
21   He's the director of graduate studies, so I have
22   to interact with him for a variety of reasons
23   other than this.
24 Q   So you had had other interactions with Professor
25   Weaver, then, outside of this whole context?

---

67

1  A   Yes.  Mm-hmm.
2  Q   I do remember you said when you were presented
3    that email, or at least the posting by the dean
4    and/or Professor Weaver, you deferred to your
5    testimony at the Office of Student Ethics.  Do I
6    have that right?
7  A   Mm-hmm.
8  Q   Did you then make any comment admitting or
9    denying making that posting on Facebook?
10 A   In that meeting?
11 Q   In that meeting specifically?
12 A   No.
13 Q   So you just deferred?
14 A   Mm-hmm.
15       (Deposition Exhibit 6 was marked for
16   identification.)
17 Q   Do you recognize this document?
18 A   Yes, I do.
19 Q   Is this the decision that the dean provided to
20   you?
21 A   Indeed it is.
22 Q   Was this mailed to you, or how was this given to
23   you?
24 A   This was both emailed to me and physically
25   mailed to me.

---

68

1  Q   Did you meet with Dean Shanahan again, in
2    person, around this time or before receiving
3    this?
4  A   Not at all, no.
5  Q   Do you remember what your thoughts were when you
6    received this?
7  A   Humored.  But not in the "ha-ha" kind of way,
8    sort of in the "this is ridiculous" kind of way.
9    That was sort of my gut reaction at the time.
10 Q   So if you turn to the second page of the actual
11   letter.  First full paragraph, it says "First,
12   you failed to convince me that the threats were
13   not from you."
14 A   Mm-hmm.
15 Q   Then he said "Second, even if they were
16   'undeliverable,' they are the sort of behavior
17   that we cannot have from our employees."
18       Did you make comments during the meeting
19   that possibly the quote/unquote threats or the
20   postings were not from you?
21 A   No.  I simply, in that meeting, deferred to my
22   OSE, OSE hearing, and that was it.
23 Q   Okay.  Then on the next paragraph, it says, in
24   the second sentence, "You asserted in your email
25   to Dr. Weaver that 'no action will be taken' by

---



69

1    them," meaning the Office of Student Ethics,
2    "and that the Student Ethics process was
3    resolved."
4        Do you remember emailing that to him?
5  A  Yes, I do.
6  Q  Do you know why the dean says you affirmatively
7    misrepresented that outcome?
8  A  It's a belief that the dean has.
9        As I interpreted the Office of Student
10    Ethics' "determination," I guess you can call
11    it, was indeed no action.  My status as a
12    student was not affected at all.  I was not
13    required to do anything that would affect my
14    studies or anything like that.  I interpreted
15    that to mean "We're not going to do anything to
16    you."  In all fact, that was the case.
17        So I would not say that I affirmatively
18    misrepresented the outcome of that meeting.  I
19    simply stated that I'm still a student, and I'm
20    not suspended or expelled or anything like that.
21  Q  Then on the next page, it says "Your appointment
22    will end at the end of the semester."
23        Did that, in fact, happen?  Your
24    appointment ended at the end of the semester?
25  A  Yes, it did.

70

1  Q  Then it says "You have fourteen days to appeal
2    this decision."
3  A  Mm-hmm.
4  Q  Did you appeal this decision?
5  A  Yes, but not through the grievance procedures.
6  Q  Why didn't you use the grievance procedure?
7  A  Because at that point I felt it was irrelevant.
8    It was not going to help.  There was a separate
9    channel for this sort of thing.  That's why I
10    did.
11  Q  So there's two separate ways to appeal and you
12    could just choose whichever?
13  A  I believe -- I'd have to look at the document,
14    obviously, but I believe the link provided in
15    the last page of the email is for grievances,
16    labor grievances, prior to termination, or
17    without that hanging over your head.
18        The procedure I followed was for
19    termination of faculty or SAAs.  So that's what
20    I went with.
21  Q  I see.  So it would have been like post
22    termination --
23  A  It would have been sort of an ongoing thing.  A
24    grievance might be like, you know, "I don't like
25    the way I'm being treated," you know, "This is

71

1    unfair," that kind of stuff.  The other process
2    is for "You fired me," or, "You're about to fire
3    me."
4  Q  I see.  The process you chose is the one "You
5    fired me," or, "You're about to fire me"?
6  A  Yes.
7  Q  Do you remember what the first step, then, of
8    the appeal process is or was for you?
9  A  Yes.  I had to file a formal appeal with
10    somebody within the university.  I don't recall
11    their exact name.  They handle specifically
12    these sort of things.  So I wrote up a short
13    explanation of what I was going through and why
14    I'm seeking this.  And then that office took it
15    from there.
16  Q  Was the mediation panel part of that office?
17  A  Yes.
18  Q  And do you decide who makes up the mediation
19    panel, or do you know how that body is
20    determined?
21  A  I believe it is determined by that office in the
22    university.  Neither I nor The Media School has
23    any control over who gets to sit on that.
24  Q  Do you know, and you might not, if it's the same
25    mediation panel for the entire year for any

72

1    mediation or if it's case by case?
2  A  I don't know.  I suspect it would be case by
3    case though.
4  Q  Did you know before the mediation who made up
5    your panel?
6  A  I was given a list of names, I believe, yes.
7  Q  Was it faculty? students? both?
8  A  I believe they have a specific set of rules.  I
9    forgot the exact numbers.  There's a certain
10    number of full-time faculty and a certain number
11    of grad students.  So it's a combined thing, but
12    it's set in their procedures.
13  Q  Is it five total?
14  A  I don't recall exactly.  Five or six, perhaps,
15    somewhere around that number.
16        (Deposition Exhibit 7 was marked for
17    identification.)
18        On the last page --
19        I guess, first, do you recognize Exhibit 7?
20  A  Yes, I do.
21  Q  The last page of it, is this the written
22    statement or appeal that you provided to the
23    office for the mediation panel?
24        I guess a better question would be:  Did
25    this initiate your appeal of the termination



73

1    decision?
2 A  Let's see.  With regards to the last page
3    specifically?
4 Q  Yes.
5 A  Yes.  This is mostly my words.  Perhaps the
6    things the bolded parts:  "SAA role, person
7    or unit being complained against," those
8    probably are not my words, but all of the rest
9    of that stuff -- the filled-in portions
10   underneath, those bolded headings -- those are
11   all my words.  Yes.
12 Q  This might have been with a form that you kind
13   of inserted the paragraphs to?
14 A  To the best of my recollection, yeah, it
15   probably was a form that they had that I filled
16   out.
17 Q  And when you submitted, I guess I'll just say
18   the written information on the last page, did
19   you know that mediation was that first step, or
20   did you find that out later?
21 A  I familiarized myself with the process at -- the
22   Faculty Council, I think, is the name of the
23   office.  I familiarized myself with the process.
24   I knew mediation was step one, and there's
25   further steps after that.

74

1 Q  Okay.  Great.
2        So the next email looks like it's from
3    Steve Sanders.
4 A  Mm-hmm.
5 Q  Who's Steve Sanders?
6 A  He was the chair of the mediation panel.
7        I think it says in his signature, chair --
8        (Reporter request for clarification.)
9        MR. MEISENHELDER:  It was in his signature.
10 A  Okay.  In his email signature, one of his titles
11   is "Chair, Bloomington Faculty Council Student
12   Affairs Committee."
13 BY MS. MACCHIA:
14 Q  So then after receiving this email from Steve
15   Sanders, did you provide any additional written
16   information or documents or anything to the
17   mediation panel or to the office?
18 A  I really can't recall.
19 Q  Do you know if the dean was able to submit
20   written documentation?
21 A  I don't know.
22 Q  Did you ultimately have a mediation?
23 A  Yes, we did.
24 Q  If I said that was on November 18 of 2016, does
25   that sound accurate?

75

1 A  It sounds accurate.
2 Q  Prior to that mediation, did you meet with Steve
3    Sanders or any of the other mediation panel
4    members?
5 A  Sanders had requested to meet with me and I
6    obliged.  I met with Sanders briefly.
7 Q  Do you know the purpose of that meeting?
8 A  I think maybe he wanted to sort of get a feel
9    for who I was, perhaps.  I don't know.  It's
10   speculation on my part.
11 Q  Based on what was discussed, did he attempt to
12   get a better understanding of your grievance?
13 A  Yeah.  He asked pertinent questions about why I
14   was filing this and what I'm seeking and what
15   happens and that kind of stuff, you know, the
16   questions he should be asking, I guess.  Yeah.
17 Q  He reached out to you to set that meeting up; is
18   that right?
19 A  To the best of my recollection, yes.
20 Q  Do you know if he also met with Dean Shanahan?
21 A  If I did know at any point, I would have
22   forgotten.  I don't know.  I'm sorry.
23 Q  No, that's okay.
24        So then going to the mediation, how is that
25   set up?  Are you individual from the dean the

76

1    whole time?  Is there a joint session?  Can you
2    talk about that.
3 A  Sure.  It begins as a joint session.  The
4    committee introduced themselves; what their
5    roles were outside of this, pleasantries, and so
6    on and so forth.
7        So there's a period of time where the dean
8    and I would have been in the room together, and
9    we would have answered questions, stated our
10   cases, what have you.  And then after that, they
11   would have -- they split us up and talked to us
12   individually.
13 Q  Is the mediation confidential?  Do you know?
14 A  I do not know.
15 Q  Did you have the understanding that what you
16   individually told the mediation panel would stay
17   between you and the mediation panel and not be
18   shared with Dean Shanahan?
19 A  I can't recall.
20 Q  Just to let you know, when we have mediations,
21   it's typically we have to kind of authorize,
22   "Oh, you can tell the other side we're saying
23   this," and we'll say things confidential.
24 A  If it makes a difference, I never heard anything
25   the dean said in his portion, so I believe that



Pietro Tommaso Calautti
September 26, 2018

77 to 80

---

**77**

1    they were.  Like whatever I said to them was
2    just to them, and whatever the dean said to them
3    was just to them.  I don't think that was shared
4    between us.
5  Q   Okay.  So then during the mediation session, is
6      it up to you and the dean to come to a
7      resolution, or did the mediation panel make a
8      recommendation?
9  A   As I recall, after the mediation panel is done
10     with their questioning and seeing all the
11     evidence and what have you, they make a
12     recommendation.
13  Q   Do you remember about how long the mediation
14      session took?
15  A   Overall?  A couple of hours.
16  Q   Okay.  And was it a situation where the
17      mediation panel would split up between you and
18      the dean, or was it all five with you at once
19      and then all five with him and so on?
20  A   It was all, all of them together with both of us
21     initially and all of them together with me and
22     all of them together with the dean.  At no point
23     in time did the committee split up.
24  Q   Are there witnesses that are present during the
25      mediation panel?

---

**78**

1  A   No one's present other than the panel members
2      and whoever's involved in the dispute.  That was
3      the only people involved in that.
4  Q   Could you have had a legal counsel if you
5      wanted?  Do you know?
6  A   I don't recall.
7  Q   Did you request a lawyer or anything like that?
8  A   The university's not going to provide one for
9      me.
10  Q   Sure.  Sure.  But you didn't ask if you were
11      allowed to or anything?
12  A   Well, I couldn't afford one anyway, so I don't
13     think I even bothered asking, to be honest.
14  Q   Sure.
15         So when you left the mediation session, did
16      you have any feeling whether it was going to be
17      able to get worked out?
18  A   It was tough to read the panel, really.  So I
19     simply stated what I stated and sort of left it
20     in their hands.  I didn't really have an
21     expectation one way or the other how it would
22     go.
23  Q   Did they tell you how long it would take to have
24      a recommendation together?
25  A   I believe so, but I don't recall exactly how

---

**79**

1    long.  Certainly by the end of the semester.
2  Q   Mm-hmm.
3  A   But if they did, I can't say what the time frame
4      they gave me was.
5  Q   Are Ph.D. students on the same semester as the
6      undergrad students?
7  A   I believe they are.  Yes.
8  Q   So your semester would have ended in early
9      December?
10  A   Yes.  But I don't think it would have taken that
11     long.  My gut says it probably would have
12     happened before Thanksgiving or right after,
13     something like that.  I don't think it would
14     have taken that long to come to a decision or
15     come to a recommendation.
16  Q   Sure.
17         Did you receive a copy of the mediation
18      panel's recommendation?
19  A   I did.
20  Q   At the time it was given, or did you have to
21      request it?
22  A   At the time it was given.
23         (Deposition Exhibit 8 was marked for
24     identification.)
25         (A recess was taken between 11:11 a.m. and

---

**80**

1    11:20 a.m.)
2  BY MS. MACCHIA:
3  Q   You've been handed what's been marked as
4      Exhibit 8.  Does that look like the Mediation
5      Panel Report that you were provided?
6         You can take a second to look through it if
7      you want.
8  A   It is indeed.
9  Q   That's actually my only question about that.
10         Did the dean accept the recommendations
11      made by the mediation panel?
12  A   No.  He rejected the agreement.
13  Q   Did he ever provide you a reason for denying?
14  A   I believe he provided the committee.  I don't
15     think I got that, but I think that he might have
16     sent something to the committee.
17  Q   But nothing that you ever saw?
18  A   Not that I can recall, no.
19  Q   When you found out that the dean was not
20      accepting the recommendations made by the
21      mediation panel, did he inform you of that via
22      email or in-person meeting or otherwise?
23  A   It certainly wasn't in person, I can say that
24     much.  Whether or not he communicated that to me
25     directly or that was communicated to me by the

---



Pietro Tommaso Calautti
September 26, 2018

81 to 84

---

81

1    committee, I don't recall.  But it was -- it
2    would have been communicated to me
3    electronically.
4        (Deposition Exhibit 9 was marked for
5    identification.)
6  Q  You're being handed what's marked as Exhibit 9.
7    My only question is, does this look like an
8    email that you would have received from the dean
9    informing you that he did not accept the
10    mediation panel's decision or recommendation?
11 A  Yes, this is.  This would have been it.
12 Q  And then it looks like in this email, he also
13    provides a link that shows or that would provide
14    you with the appeal process?
15 A  Mm-hmm.
16 Q  Did you end up using that link and figuring out
17    how to appeal further?
18 A  I don't recall if it was directly from that
19    link, but I did appeal it further, yes.
20 Q  What was the next step in that appeal?
21 A  The next step was I believe what they refer to
22    as the "board of review," which is a binding
23    agreement.  So the mediation is nonbinding
24    obviously.
25        The next step is a similar process, a

---

82

1    similar thing where you meet in front of a
2    panel.  They ask you questions and such.  They
3    make a binding -- I believe the process is
4    actually they make a recommendation to the
5    provost, and the provost's decision is binding.
6  Q  I see.  So the provost's decision would be the
7    final internal decision?
8  A  Correct.  Yes.  The provost is not a party to
9    any of these hearings at all.  The provost only
10    has information that the board of review gives
11    them.  So they make their determination based on
12    that it can go either way.  They can follow the
13    recommendation or they cannot, but only the
14    provost can make that decision.
15 Q  Does the board of review have knowledge of what
16    the mediation panel recommended?
17 A  That, I don't know.  There's a procedure
18    somewhere buried in here.  There's something in
19    there that I remember they have limited or maybe
20    no -- I don't know if direct or indirect access
21    to anything that happened in mediation.  But
22    it's guarded to some degree.  I don't know what
23    it is exactly though.
24 Q  So how did you or do you remember how you
25    initiated the next step in the appeal to the

---

83

1    board of review?
2  A  Well, if you look at the date on Exhibit 9, it's
3    sent at 10:04 a.m. on December 9 of 2016.
4    Immediately -- or I guess probably that Monday
5    at the latest, I would have filed the follow-up
6    appeal for the board of review hearing.  Does
7    that answer your question?
8  Q  Yes, yes.
9        The, I guess for lack of a better word,
10    petition or appeal petition, would that have
11    been something that was a form, kind of like
12    what we saw before, or is this something that's
13    completely in your own words or your own
14    description?
15 A  I don't recall exactly.
16 Q  Okay.
17 A  But it would have been something, you know,
18    written, I imagine.  Yeah.
19 Q  Did you seek guidance from anybody at the
20    university in taking this next step to the board
21    of review?
22 A  I didn't seek any guidance, no.
23 Q  Did you get any assistance in preparing your
24    petition?
25 A  Not preparing the petition, no.

---

84

1  Q  Was Steve Sanders involved at all in your appeal
2    process after the mediation panel?
3  A  In a limited capacity he was, yes.
4  Q  What was his capacity?
5  A  He acted as a witness, you would call it, in the
6    board of review hearing.  Or he gave testimony,
7    I should say, at the board of review hearing,
8    being the chair of the mediation committee.  He
9    also set me up with a law student by the name of
10    Jeffrey Soller, I believe --
11 Q  Okay.
12 A  -- whom --
13        I was prepared to go into that meeting by
14    myself.  I could not afford counsel.  But
15    Sanders recommended that I take this law student
16    as my counsel for that hearing.  I figured it
17    was better than nothing and he would work for
18    free so --
19 Q  Always helps.
20        To your knowledge, is Steve Sanders a
21    professor at the law school?
22 A  He's indeed a professor at the Maurer law
23    school.  He may not be currently.  I don't know
24    if he moved or something like that, but at the
25    time he was.

---

85

1 Q  Sure.
2       (Deposition Exhibit 10 was marked for
3    identification.)
4 Q  You're being handed what's been marked as
5    Exhibit 10.  It's six pages long, so I'll give
6    you a minute to familiarize yourself.
7 A  Okay.
8 Q  Okay.  So then let's start at the first email in
9    the string, so the very back or the very last
10   page, so we can go in chronological order.  It
11   looks like it's an email from you to Steve
12   Sanders on December 13 of 2016.
13       Do you see that?
14 A  Yes.
15 Q  Okay.  You say "I would indeed seek the
16   assistance of the committee in preparing my
17   statement to the board of review."
18 A  Mm-hmm.
19 Q  Is that a process that the mediation panel
20   offers students or, I guess, teaching assistants
21   or SAAs that are appealing?
22 A  I don't know.
23 Q  What caused you to request assistance then?
24 A  Given the phrasing, I have to venture a guess at
25   best.  It would be that they normally do, do

86

1    that kind of thing.  So that would be why, you
2    know.
3 Q  So then the next email is from Steve Sanders to
4    you dated December 13, 2016.  Is it accurate for
5    me to describe this email as him just giving you
6    a little bit of guidance on how to structure
7    your written statement for the board of review?
8 A  May I speak with my attorney for a second?
9 Q  I'm going to ask you to answer the question
10   before we take a break.
11 A  I believe any information that Sanders and I
12   would have had is privileged.
13 Q  This document was produced, so if there was a
14   privilege, it's been waived.
15 A  Okay.
16 Q  Was Steve Sanders your attorney at that time?
17 A  Well, he is a lawyer.
18 Q  I will tell you that just having a conversation
19   with a lawyer doesn't necessarily mean it's
20   privileged.  There needs to be a client-lawyer
21   relationship there.
22       Do you believe that you had that
23   relationship?
24 A  I believe so, yes.
25 Q  So were you supposed to give this to me then?

87

1       MR. MEISENHELDER:  For the record, I made
2    the decision to give it to you.
3 BY MS. MACCHIA:
4 Q  So did Steve Sanders assist you in drafting your
5    statement based on this email?
6 A  Based on this email, yes.
7 Q  All right.  Next email up, it looks like you
8    provided a rough draft; is that right?
9 A  Mm-hmm.  Yes, indeed.
10 Q  Then on page 3, there's an email from Steve
11   Sanders dated December 14, 2016.  And he says he
12   did some substantial rewriting and reorganizing.
13       Do you see that?
14 A  I don't.
15 Q  It's in the first sentence of his December 14
16   email, on the bottom of page 3, of the email
17   string.
18 A  There's two emails on December 14, I believe.
19 Q  So it's the one that starts on the bottom of
20   page 3 of the string, the middle of the
21   page-ish.  It says "Peter, I've tried to
22   preserve the essence of what you wrote."
23 A  Uh-huh.
24 Q  "But as you'll see, I did some substantial
25   rewriting and reorganizing."

88

1       Do you see that?
2 A  Yes, I do.
3 Q  Is it fair to say that he actually did assist
4    you in preparing your statement to the board of
5    review hearing?
6 A  Now that I see this, yes.
7 Q  Did you not remember this before?
8 A  No, I did not.  No.
9 Q  Then I'm going to skip to -- on page 2 of the
10   string, there's another email dated December 14
11   of 2016 from Steve Sanders on the top of the
12   page.
13       The second paragraph, he says "I think you
14   got a mediation panel that was unusually
15   protective of speech and willing to suggest
16   limits on the university's reach."
17       Do you see that sentence?
18 A  I do.
19 Q  Did he ever tell you why he thought they were
20   unusually protective of speech?
21 A  No, I don't believe so.
22 Q  Do you agree with that assessment?
23 A  I wouldn't know.  I have no relationship with
24   any of the other members of the mediation panel,
25   so I really don't know what their opinions are



Pietro Tommaso Calautti
September 26, 2018

89 to 92

89

1   on that.
2       (Deposition Exhibit 11 was marked for
3   identification.)
4 Q   You've been handed what's been marked as
5   Exhibit 11. Was this your written statement to
6   the board of review?
7       You can take a minute to look through it.
8 A   Thank you. This appears to be either that
9   document or a draft, yes.
10 Q   So then under the heading, it says "Social media
11   postings wrongfully attributed to me."
12       Then four lines down, it says "These
13   statements are fabrications."
14 A   Mm-hmm.
15 Q   Do you see where that is?
16 A   Yes.
17 Q   Which Facebook statements were you saying were
18   fabrications or characterizing as fabrications?
19 A   Well, certainly the ones -- the other ones here
20   present; that I have no recollection of making.
21 Q   You're talking about the ones in Exhibit 1 other
22   than that top post there?
23 A   It appears so, yes.
24 Q   Did you at any point say that the top post on
25   that page 2 of Exhibit 1 was falsely attributed

90

1   to you?
2 A   I did.
3 Q   You said it was falsely attributed to you?
4 A   Mm-hmm.
5 Q   Why did you say it was falsely attributed to you
6   when you had admitted prior that it was not
7   falsely attributed to you?
8 A   Could you be more specific in that question.
9 Q   Sure.
10       Why did you take the position now, with the
11   board of review, that that top statement on
12   page 2 of Exhibit 1 was falsely attributed to
13   you when, prior to that, you had admitted making
14   that posting?
15 A   Simple desire to preserve my job, I presume. I
16   didn't think that I would get a fair hearing in
17   any of this process whatsoever after my
18   experience at Office of Student Ethics, and I
19   thought it was the best course of action at the
20   time.
21 Q   Okay. So is it safe to say it was a lie?
22 A   Yes.
23 Q   At this point, did you think that the dean was
24   taking action against you based on your
25   political views?

91

1 A   I thought that that was the case from the very
2   beginning. Yes.
3 Q   You did. Okay.
4       Was it based on articles you had written or
5   your views or just altogether everything?
6 A   Altogether everything, yes.
7 Q   Do you know what Dean Shanahan's political views
8   are?
9 A   Left of center.
10 Q   How do you know that?
11 A   Statements he's made in casual conversation,
12   either to groups of students or individually.
13 Q   Why do you think that the catalyst or at least
14   one of the catalysts behind the dean's decision
15   to terminate -- or I guess I should ask the
16   first question: Do you think that your
17   political views was a catalyst behind the dean's
18   decision to terminate your employment?
19 A   I think so. Yes.
20 Q   Why do you have that belief?
21 A   In the meeting between Dean Shanahan, myself,
22   and Andrew Weaver, in a completely unprovoked
23   way, Shanahan brought up some editorial work
24   that I had done concerning my political views.
25   This was not a part of any conversation we were

92

1   having. And he mentioned that I appeared in
2   either in quotation in The Chronicle of Higher
3   Education article stating my political views, or
4   that I had written an article for Vox stating my
5   political views and what it's like to be someone
6   of my political persuasion in academia.
7       I know it identified me with Indiana
8   University in both counts.
9       Furthermore, if you look at Bahga's initial
10   email to the dean, or I assume his initial email
11   to the dean, in document Exhibit 1 -- let's see.
12   Yes.
13       If you look at the very bottom of the first
14   page of that, he says "Mr. Calautti is an avowed
15   neo-Nazi," which I will state I am not, "and a
16   vocal Trump supporter." And although, I don't
17   believe it is here, the Office of Student Ethics
18   does have a copy of the dean's response to this
19   email, and I was shown that. And at no point in
20   time did the dean say that being a Donald Trump
21   supporter is -- that that's something we don't
22   handle. It's not a problem. So the dean seems
23   to have agreed with, as one of my offenses, that
24   I'm a Donald Trump supporter.
25 Q   So based on the dean's response to Bahga's



93

1    email, you're assuming that he thinks being a
2    Trump supporter is not a good thing?
3  A  Well, that, along with what he said in the
4    meeting.
5  Q  Okay.  Sure.
6       When the dean was talking about this during
7    your September meeting, did he just, out of
8    nowhere, say, "Oh, I saw your article," or how
9    did that come about?
10 A  It's been a while since I listened to that
11   recording, but I recall at the time being
12   completely caught off guard that he would even
13   bring something like that up.  I found it quite
14   shocking because it came out of nowhere.  And it
15   was somewhat accusatory, his tone.
16      So yeah, it was -- it was sort of out of
17   left field.  Why would he bring something like
18   that up?  This is a labor dispute concerning
19   whether or not I said something offensive to
20   some stranger on the Internet.  Why does my
21   personal political views being expressed
22   publicly have anything to do with it?
23 Q  Did you say that to him at that time, or how did
24   you respond to him bringing up your articles?
25 A  I believe I paused and put a quizzical look on

94

1    my face and simply continued on with the
2    conversation.  I don't recall if I directly
3    addressed that or no.  It caught me off guard
4    because it was such a strange thing to even
5    bring up.
6  Q  Do you remember if you addressed that specific
7    situation with the mediation panel?
8  A  I did bring it up.  I did say that I think this
9    was ideologically motivated, and I think I did bring up
10   the fact that at some point in that process, the
11   dean did mention that in the meeting that I had
12   with him, and I found it unusual and part of why
13   I was terminated.
14 Q  So the dean, is he the dean of just The Media
15   School?
16 A  He is just dean of The Media School, not the
17   whole university, no.
18 Q  Do you know if there are other Trump
19   supporters -- is that what -- let me back up.
20      Is the political view that you think
21   he has a problem with, you being a Trump
22   supporter, or is it that you're a conservative,
23   or how would you describe that?
24 A  Probably that I'm simply a non-leftist.  It does
25   not necessarily tie my -- tie into any one

95

1    specific thing.  It's a combination that I'm
2    both right of center and a Trump supporter and
3    so on.
4  Q  So do you know if there are other students
5    within The Media School that are on the
6    conservative side or right of center?
7  A  None among the graduate students, I can tell you
8    that.
9  Q  How do you know that?
10 A  Conversations with these people.  There's not
11   very many of us.
12 Q  How many were there at the time, if you can
13   remember?
14 A  In my cohort, perhaps at the most 20.  So it's a
15   very small number.  It's double digits at the
16   very most.  It's not even close to a hundred, I
17   don't think.
18      But among the undergrads, I can't say
19   because there's thousands of them.  I don't
20   know.  There's probably some conservatives among
21   them, but I don't know any of them individually.
22 Q  Does The Media School have a master's program?
23 A  They do.
24 Q  Do those students get academic appointments as
25   well?

96

1  A  They do as well, yes.
2  Q  Do you know if any of those academic
3    appointments were conservative or far right or
4    anything?
5  A  No.  I'm including that.  The 20 people or so,
6    that includes the master's students.
7  Q  I see.  So that would include anyone that would
8    be a student academic appointee?
9  A  Correct.
10 Q  When did the articles you referred to in The
11   Chronicle of Higher Education -- and did you say
12   the other one was in Vox?
13 A  Vox.  Yes.
14 Q  When were they published?
15 A  Sometime during the Republican primaries of that
16   election cycle, so spring of 2016 roughly,
17   thereabouts.  Donald Trump had not secured the
18   nomination by that time.  I can say it was
19   before that.
20 Q  Okay.  Do you know that your Facebook posting
21   was also a catalyst in the dean's decision to
22   terminate your employment?
23 A  I believe it was a pretext.
24 Q  What do you mean by "it was a pretext"?
25 A  This is something that was brought to light to



97

1   him in the Office of Student Ethics, and he saw
2   it as an opportunity.
3 Q   Do you think you publishing or being --
4       Was it articles written by you or were you
5   quoted in them?
6 A   I was quoted in The Chronicle of Higher
7   Education article, and I the wrote the Vox
8   article.
9 Q   Is it your position that you were terminated
10   based on being quoted in The Chronicle of Higher
11   Education article?
12 A   Not exclusively but yes.
13 Q   That's one of the reasons?
14 A   Mm-hmm.
15 Q   And then also for writing the article in Vox?
16 A   Yes.
17 Q   And are your free speech claims in this lawsuit
18   based on those articles in any way?
19 A   I'm not sure how to answer that question.  Can
20   you clarify.
21 Q   Sure.
22       So my understanding of your claim is that
23   you're saying the university or Dean Shanahan
24   violated your free speech rights by terminating
25   your employment and basing that decision on a

98

1   speech that you made.  So I'm trying to
2   determine what speech links that claim.
3       So is it the articles?  Is it the Facebook
4   posting? all of the above?
5       MR. MEISENHELDER:  For the record, I'm
6   going to object.  That calls for a legal
7   conclusion that he's not qualified to give.
8       But you can go ahead and answer the
9   question.
10 A   I don't understand the question, so I can't
11   answer it.
12 BY MS. MACCHIA:
13 Q   Okay.  We'll leave that alone for right now.
14       Did you provide any other written statement
15   to the board of review prior to the hearing?
16 A   I don't recall.
17 Q   Do you know if Dean Shanahan or the university
18   provided a written statement?
19 A   I suspect that they must have, but I don't know
20   for certain.
21 Q   Do you know if you saw that or anything?
22 A   I can't recall.
23       (Deposition Exhibit 12 was marked for
24   identification.)
25 Q   You're being handed what's been marked as

99

1   Exhibit 12.  I'll let you take a look at that.
2 A   Okay.
3 Q   Does this appear to be another written statement
4   that you provided to the board of review?
5 A   Yes.  It's a response to Dean Shanahan's
6   submission to the board of review.
7 Q   Did you again have assistance from either Steve
8   Sanders or Jeff Soller in preparing this
9   document?
10 A   I believe so, yes.
11 Q   Any other documents or anything like that, that
12   you can think of, that you provided the board of
13   review prior to the hearing?
14 A   None that I can recall at this time, no.
15 Q   Did you select witnesses to have at the hearing?
16 A   I did.
17 Q   Who were those people?
18 A   I believe it was only Thomas French.
19 Q   Who is Thomas French?
20 A   Thomas French is a faculty member of The Media
21   School.
22 Q   Why did you choose to have him present on your
23   behalf?
24 A   He was the only faculty member I had served as a
25   teaching assistant that was still at the

100

1   university.  He would have seen me in the
2   classroom.  He would have had direct knowledge
3   of how I direct the students and how I conduct
4   myself.
5 Q   So would he have been the professor for your
6   first semester as a teaching assistant or
7   second?
8 A   Second.
9 Q   The one for the first semester had left the
10   university?
11 A   Correct.
12 Q   Did you meet with any of the board of review
13   members before the hearing at all on an informal
14   basis or formal basis?
15 A   No.  I never met with any of them, no.
16 Q   Do you remember how many members there were?
17 A   Five or six, thereabouts.
18 Q   Do you know how that board is made up?  If it's
19   faculty? students? both?
20 A   I believe it follows the same or similar
21   guidelines of the mediation committee.  It's a
22   certain set number of faculty and a certain set
23   number of graduate students.
24 Q   Did you know any of them prior to the hearing?
25 A   Not at all.  No.



101

1     (Deposition Exhibit 13 was marked for
2  identification.)
3  Q  You've been handed what's been marked as
4     Exhibit 13.
5  A  Okay.
6  Q  All right.  Do you remember receiving this email
7     on March 2nd, 2017?
8  A  Yes.
9  Q  My question on this is, what Steve Sanders says
10    here, does that accurately describe his role in
11    assisting you throughout the appeal process?
12 A  It's something you're going to have to ask
13    Sanders about.
14 Q  So he assisted you, so you were the recipient of
15    his assistance.  So does this accurately reflect
16    what your understanding of his assistance was to
17    you?
18 A  I mean, I concur with his final statement on
19    this.  "On request, the committee shall assist
20    the grievant in drafting a statement of the
21    grievance and may assist the grievant in other
22    ways in preparing a case for presentation to the
23    board."
24        I believe he's acting in that capacity.
25 Q  What about where he says "Peter drafted his

102

1     original appeal to the BOR, and I reviewed it
2     and assisted him in revising it.  I also drafted
3     a reply to Shanahan's response, which Jeff
4     reviewed and Peter adopted as his own."
5         Do you agree with that statement?
6  A  I agree that it's consistent with the final
7     quote that he has in here.
8  Q  What I'm asking is, do you agree that that's
9     what assistance he provided to you?  Is that an
10    accurate statement of what he did for you or
11    with you?
12 A  Yes.  Yes.
13 Q  Okay.  And is there anything else that he
14    provided assistance with that isn't mentioned
15    here?
16 A  Not that I can recall.
17 Q  Was the board hearing on March 2nd, 2017?
18 A  Sounds approximate.  I can't say for certain
19    though.
20 Q  Were you represented by anyone other than Jeff
21    Soller? another counsel or lawyer?
22 A  No.
23 Q  And you said earlier he's a law student --
24    right? -- at Maurer?
25 A  At the time he was.  Yes.

103

1  Q  Do you remember if Dean Shanahan or the
2     university had any witnesses during that
3     hearing?
4  A  No.  They did not.
5  Q  How was this hearing set up?  Was this something
6     where you gave a statement, or was it the board
7     members asking you questions?
8  A  To my recollection, we opened each with
9     statements, and then the board asked us
10    questions and talked to a witnesses and so on.
11 Q  So other than the board members, you, Jeff
12    Soller, Dean Shanahan --
13        And was the university or was the dean
14    represented by counsel?
15 A  The dean was represented by university counsel.
16    Yes.
17 Q  So other than the board members, you, Jeff
18    Soller, Dean Shanahan, university counsel, and
19    Thomas French, was anyone else in the hearing?
20 A  There may have been someone, a technical
21    assistance person to help with like the AV
22    equipment and something like that.  There might
23    have been someone like that, but I don't recall
24    exactly.
25 Q  Nobody else that gave substantive testimony or

104

1     questioning or anything like that?
2  A  No.
3  Q  Jeff Soller, was he able to question witnesses
4     or question the dean, or did you do that or did
5     anybody?
6  A  I don't believe any direct questioning was given
7     on either party, to be honest.
8  Q  It would have just been the board asking
9     questions?
10 A  I believe so, yes.
11 Q  So you said that you were able to provide an
12    opening.  And during this opening, did you
13    present your side of the story, or do you
14    remember what you said?
15 A  I certainly presented a time line of events.
16 Q  Mm-hmm.
17 A  That's all I can really remember from that as
18    certain.
19 Q  Sure.
20 A  Yeah.
21 Q  Did you also have a closing? an opportunity for
22    a closing?
23 A  Not that I can recall.  No.
24 Q  Did you feel at that time that you were able to
25    adequately represent yourself during that



---

**105**

1     hearing?

2 A  Given the confines of what the university

3     allowed, yes, I think so.

4 Q  **What do you mean by "the confines the university**

5     **allowed"?**

6 A  It was not, you know, an actual legal thing.

7 Q  **Mm-hmm.**

8 A  It has the simulacra of that, but it's not -- I

9     was not afforded the rights I would be afforded

10     if this were a state or federal matter.

11 Q  **Were you provided the opportunity to respond to**

12     **the allegations against you?**

13 A  Again, not in the same capacity that I would if

14     I was -- if this was an actual court.

15 Q  **What is the difference?  What would you have**

16     **done maybe in court that you didn't do during**

17     **the hearing?**

18 A  I had no subpoena authority, obviously.  I

19     can't, you know, force people to testify or

20     anything like that.

21 Q  **Did you ask anyone to testify who said no?**

22 A  Not that I can recall, no.  But, I mean, getting

23     Auernheimer was difficult because he lives

24     abroad, that kind of thing.

25     But, for example, I also am not -- the

---

**106**

1     standard of guilt, so to speak, is the

2     preponderance of the evidence and not beyond a

3     reasonable doubt.  The university can sort of

4     bend and break the rules as they see fit in

5     terms of what is and isn't a constitutional

6     protection, in a sense, because it isn't an

7     actual legal proceeding.

8 Q  **Did you feel like you had an adequate**

9     **opportunity to present your side of the story?**

10 A  I was given, yeah, an opportunity to -- again,

11     under the constraints of the university policy,

12     yes.

13     For one thing, I was never able to get any

14     copy of anything OSE had.  I would have liked

15     that.  So I couldn't get any of that stuff.  But

16     for, you know -- for what I was allowed to do,

17     yes, I was given time and an opportunity to do

18     so.

19 Q  **So during the board of review hearing, did you**

20     **talk about what happened with OSE?  And by**

21     **"OSE," are you talking about the Office of**

22     **Student Ethics?**

23 A  Yes, I am.  Sorry.

24 Q  **Okay.**

25 A  I believe it was brought up briefly as part of a

---

**107**

1     time line of events thing.  Like after, you

2     know, I had the OSE hearing then.  This is a

3     result of it.  I think that was really about it.

4     And I may have made a statement along the

5     lines of, you know, I considered the matter done

6     after that, or any subsequent labor things sort

7     of took me by surprise.  That was really the

8     extent of, if anything, really, again as best I

9     can recall, I brought up about OSE.

10 Q  **So had you had OSE documents -- and by**

11     **"documents," do you mean those meeting notes?**

12     **So had you anything else besides those meeting**

13     **notes?**

14 A  Meeting notes, whatever, you know, the documents

15     similar to Exhibit 1 that OSE had.  And any

16     other information it may have had that I'm just

17     unaware of.

18 Q  **So had you had access to that information for**

19     **preparation for the board hearing, how do you**

20     **think that would have made things different?**

21 A  Well, I could have easily drawn on direct

22     evidence that was essentially being presented

23     against me that the dean and the university had

24     access to, but I did not have access to.

25 Q  **How do you know that the dean had access to the**

---

**108**

1     **Office of Student Ethics --**

2 A  He had copies of it and he brought it.  He gave

3     it to the board.

4 Q  **He brought it to the hearing with him?**

5 A  He brought it to the hearing with him.  Yes.

6 Q  **The meeting notes or something different?**

7 A  A document similar to Deposition Exhibit 1.

8 Q  **And he was the recipient of the email in**

9     **Exhibit 1; right?**

10 A  One of them, I believe.  Yes.

11 Q  **So maybe that's why he had access to it?**

12 A  Well, it's still evidence that I didn't have

13     access to.

14 Q  **Well, right.  I'm just saying, since he was the**

15     **recipient of the email, he had access to an**

16     **email that was sent to him.**

17 A  Yes.

18 Q  **It didn't need to be provided to him by anyone**

19     **else in the university.**

20 A  Correct.  But it was being used against me, so I

21     didn't have that same luxury.

22 Q  **Anything else that you feel like you needed to**

23     **be able to present your side of the story or**

24     **defend yourself against that accusation against**

25     **you?**

---



109

1  A   I do recall that the board of review did violate
2      their own policies and procedures with the
3      scheduling of my hearing.  If you read the
4      guidelines, it's -- I think it has to happen
5      within a maximum of 30 days after I submit my
6      petition to them, or whatever you want to call
7      it, my appeal.  They have a maximum of 30 days
8      to grant me that.  I submitted that appeal
9      sometime in mid December, I believe.  And the
10     hearing was not until, I think, March 2nd, you
11     said?
12 Q   Right.
13 A   So had they stuck to their rules, a lot of
14     things probably would have been fresh in my
15     memory.  So that's something that concerned me.
16 Q   It looks like your request was Exhibit 11.  And
17     the date on that is December 14 of 2016; is that
18     accurate?
19 A   That sounds about right.  Yes.
20 Q   Do you know the reason for the lag in time
21     between December 14 and March 2nd?
22 A   I don't believe any was ever given to me.  No.
23 Q   Did you ask why it took so long?
24 A   I can't recall.  I mean, yeah, I don't really
25     recall.

110

1  Q   Was there a winter break in between that?
2  A   There was.
3  Q   Any other breaks or anything?
4  A   No.
5  Q   Did you ultimately receive a decision or a
6      recommendation from the board of review?
7  A   Yes.  But again, it was well past the stated
8      deadline that it should have been by the rules.
9  Q   Was there a deadline for them to do their
10     recommendation after the hearing?
11 A   Correct.
12 Q   Do you remember, off the top of your head, how
13     many days that was?
14 A   To the best of my recollection, ten days, I
15     believe.
16 Q   Okay.
17 A   They took until mid May, so after the semester
18     coursework had been done, so some 50-something,
19     60 days afterwards.
20 Q   Did you receive the decision right from the
21     board of review, or was that another document
22     you had to request?
23 A   The board of review just makes a recommendation,
24     and I was given that recommendation at the time
25     it was made, which would have been mid May.

111

1      Yes.
2          (Deposition Exhibit 14 was marked for
3      identification.)
4  Q   You've been handed what's been marked as
5      Exhibit 14.
6  A   Okay.
7  Q   Is this a copy of the board of review's
8      recommendation that you received?
9  A   It is.  And upon seeing the date, that is the
10     accurate date.  The provost's decision did not
11     come until after, in mid May.  I believe that
12     was a mistake there.  So yes.
13 Q   Sure.  So you're saying that the date the board
14     of review came down with their recommendation
15     was April 11?
16 A   Yes.
17 Q   And then the provost was later?
18 A   Yes.
19 Q   After you received this document in Exhibit 14,
20     is there any chance for a rebuttal or a redo or
21     anything like that, or does it just naturally go
22     to the provost?
23 A   There's no official means of appealing this
24     further.  It would go to the provost.
25 Q   Do you remember if you agreed with the board of

112

1      review's recommendation?
2  A   I did not agree with it.
3  Q   And that's because they recommended to affirm
4      the dean's decision to terminate your
5      employment?
6  A   Well, among other things, yes.
7  Q   What other things?
8  A   They relied very heavily on the OSE material and
9      the OSE -- the results of the OSE hearing, which
10     I was led to believe were confidential.
11         They -- if you read the document closely, I
12     recall they seem to have conducted some sort of
13     private investigation, it seems like almost, and
14     to speaking with people that were not a party to
15     the hearing.
16 Q   You mean the board of review members?
17 A   Yes.
18 Q   Okay.
19 A   The board of review members.  I think that's why
20     it took them so long because they sort of went
21     well beyond their stated duties in collecting
22     other material and so on and so forth.
23         I think there's actually a section here
24     where they talked with Elizabeth Spotts
25     directly.  Elizabeth Spotts had stated to me



113

1    they don't involve themselves in labor matters.
2    And anything, anything I told OSE would have
3    been confidential anyway.
4 Q  Do you know if there's a university policy that
5    says that the board of review cannot seek other
6    documents or talk to other witnesses or other
7    individuals?
8 A  I can't say for certain, but they do have a
9    stipulation that says that it's the effect that
10    anything not brought up in the hearing is -- you
11    can't take that into consideration.
12 Q  Is it your understanding that's in a policy
13    somewhere?
14 A  Yes.
15 Q  Do you remember if Professor Sanders provided
16    information directly to Provost Robel after the
17    board of review recommendation was handed down?
18 A  I don't believe so. I can't say for certain
19    though. I don't think he had any direct
20    communication with the provost, no.
21       (Deposition Exhibit 15 was marked for
22    identification.)
23 Q  You've been handed what's been marked as
24    Exhibit 15. I'll give you a second to look at
25    that.

114

1       Have you seen this before? this email?
2 A  I don't recall.
3 Q  So it looks like Steve Sanders is providing the
4    provost with a copy of the mediation panel
5    report; is that right?
6 A  It appears so. Yes.
7 Q  Did you know he was going to do that before
8    seeing this right now?
9 A  I don't recall. No.
10 Q  Do you know if the board of review had a copy of
11    the mediation panel report?
12 A  I don't recall.
13       (Deposition Exhibit 16 was marked for
14    identification.)
15 Q  You've been handed what's been marked as
16    Exhibit 16.
17 A  Okay.
18 Q  Is this a document that you provided directly to
19    the provost?
20 A  I emailed this to Provost Robel. Yes.
21 Q  Was this before she made her decision?
22 A  It was before she made her decision but after
23    the board of review had sent their
24    recommendation.
25 Q  And why did you choose to send her additional

115

1    information?
2 A  Because I felt this was information that was
3    warranted in making her decision; that was not
4    present in the board of review documents or that
5    I found to be, I guess, erroneous -- not
6    "erroneous," but needed further clarification.
7    Things that were in the board of review
8    statement that needed further clarification.
9 Q  Do you know if she, in fact, reviewed this
10    before making her decision?
11 A  As I recall, she did actually email me back and
12    say "I'll take it under consideration." Yes.
13 Q  Is there anything else that you can remember
14    providing to the provost before her decision was
15    made?
16 A  Not that I can recall.
17 Q  Did you ultimately, then, receive a decision
18    from the provost?
19 A  I did.
20 Q  Do you remember that being via email?
21 A  It was via email. Yes.
22       (Deposition Exhibit 17 was marked for
23    identification.)
24 Q  You've been handed what's been marked as
25    Exhibit 17.

116

1 A  Mm-hmm.
2 Q  Once you have a chance to look through it, is
3    this the decision that you received from the
4    provost?
5 A  It appears so, yes.
6 Q  Did she decide to ultimately uphold the dean's
7    decision to terminate your employment?
8 A  She did indeed.
9 Q  Did you disagree with that decision?
10 A  I did.
11 Q  Was there any further recourse for you within
12    the university after receiving this decision?
13 A  No. This is the final decision.
14 Q  Did you reach out to the provost for
15    reconsideration or anything like that?
16 A  I didn't feel that was warranted or appropriate,
17    so I didn't. No.
18       Even at that, there was no official means
19    of me doing that. That would have just been
20    begging, essentially.
21 Q  It's not in the procedure or anything like that?
22 A  Yes.
23 Q  So it looks like the date, on Exhibit 17, is
24    May 15 of 2017?
25 A  Correct.



117

1  Q   Was the spring semester over by that time?
2  A   As I recall, all coursework was done by that
3      time.  But I think it was finals week that week
4      or something like that.  It was just exams.  But
5      for all intents and purposes, yes, the semester
6      was over.
7  Q   Do you have exams as a Ph.D. student?
8  A   Typically no, but we do have final papers.
9  Q   So then you would have just finished your
10     academic year, then, when you received this
11     decision?
12 A   Coursework for that year.  Yes.
13 Q   But you did not have an SAA assignment for that
14     spring semester; is that right?
15 A   I did not, no.
16 Q   When did you decide that you would not return to
17     IU for the academic year the following year?
18 A   Almost immediately.  I knew that this
19     constituted de facto expulsion and that you
20     could not remain a student no matter what.  So I
21     knew that this was it, basically.
22 Q   What do you mean by "de facto expulsion"?
23 A   Can you clarify or rephrase that question for
24     me.
25 Q   Right.

118

1          So when you say the decision to terminate
2      your employment was a de facto expulsion, why is
3      that a de facto expulsion?
4  A   Well, it's simply the structure of how Ph.D.
5      students are a part of the university.
6  Q   So could you have remained a student if you
7      wanted to?
8  A   It would be irrelevant.
9  Q   Why is it irrelevant?
10 A   Well, if I may use an analogy?
11 Q   Sure.
12 A   If a doctor is allowed to attend med school but
13     never do a residency or even examine a human
14     body, would you go to that doctor?
15 Q   So what you're saying is that being an SAA is an
16     essential function of being in a Ph.D. program?
17 A   Not only is it essential, but it's also the
18     means by which we're financially able to be
19     Ph.D. students.
20 Q   Are there any Ph.D. students that aren't also
21     SAAs?
22 A   There's no Ph.D. student in The Media School or
23     any of the legacy departments that form The
24     Media School, to my knowledge, that does not
25     receive some sort of financial compensation from

119

1      the university.
2  Q   Was there other financial compensation you could
3      have applied for?
4  A   No.
5  Q   Any other on-campus-type jobs or anything like
6      that that would have provided tuition
7      assistance?
8  A   No, those -- tuition assistance is, I believe,
9      generally only limited to salaried employees.
10     Like hourly employees do not get that.  You
11     would have to be employed as an administrator,
12     or something like that, in the university.  So
13     no, it's not really feasible for me to have that
14     responsibility and be attending.  I think they
15     only cover one semester, or something like that,
16     or one course a semester.  It's not the same
17     compensation package at all.
18 Q   Do you know if there's any Ph.D. students in the
19     whole entire university of IU that are students
20     but don't also have an SAA position?
21         MR. MEISENHELDER:  For the record, I'm
22     going to object that that's irrelevant.
23         But you can go ahead and answer the
24     question.
25 A   Can you repeat the question, please.

120

1  BY MS. MACCHIA:
2  Q   Sure.
3          Are you aware of any Ph.D. students within
4      the university, as a whole, that are completing
5      their Ph.D. program or in a Ph.D. program but
6      are not also SAAs?
7  A   I'm unaware of any such Ph.D. student.
8          (Deposition Exhibit 18 was marked for
9      identification.)
10 Q   You've been handed what's been marked as
11     Exhibit 18.  Attached to this email looks to be
12     a résumé for you.
13         Do you see that?
14 A   Yes.
15 Q   Is this an accurate résumé at the time?
16 A   It would be, yes.
17 Q   Was this the first résumé that you sent out
18     after leaving IU?
19 A   I can't recall.
20 Q   In the "To" line, it's @lymelgroup,
21     L-Y-M-E-L-G-R-O-U-P.
22 A   Mm-hmm.
23 Q   Am I saying that right?  Lymelgroup?
24 A   I have no idea.
25 Q   Do you know what that is?



121

1  A   Not at all.
2  Q   Do you know why you sent your résumé to this
3      service or whoever this is?
4  A   I think I just -- from the looks of it, it
5      probably was the Craig's list posting that they
6      were looking for an administrative assistant,
7      and I applied to it.
8  Q   So on the first page of your résumé -- actually,
9      let's go back.
10         The date of this is August 27 of 2017; is
11     that right?
12 A   Mm-hmm.
13 Q   "Yes"?
14 A   "Yes." I agree.
15 Q   Then on your résumé, it says you're an associate
16     instructor at The Media School at IU, and it
17     says it was from 8/2015 to present.
18         Were you still an associate instructor in
19     2017?
20 A   I was not, no.
21 Q   Did you ever change that on your résumé?
22 A   I probably did.  This is simply a typo, an
23     oversight or something like that.
24 Q   Did you apply to any other Ph.D. programs after
25     leaving IU?

122

1  A   I attempted to transfer into the geography
2      department at IU.  That was it.
3  Q   Geography?
4  A   Yes.
5  Q   Did you have a background in geography as well?
6  A   My specialization in media lends itself well to
7      geography.
8  Q   What was your specialization in media?
9  A   Space and spatialization in mediated context,
10     film, that sort of thing, for the most part.
11 Q   Did you have to apply for a position in the
12     geography -- is that a school of geography or
13     department?
14 A   It's part of the College of Arts and Sciences.
15 Q   Did you have to apply to that college for
16     acceptance?
17 A   I don't recall the exact process.  I believe it
18     was similar to an application, but it might not
19     have been exactly the same.  I don't recall.
20 Q   You said it was for a transfer?
21 A   It was transferring schools within the same
22     university.
23 Q   Was that transfer denied?
24 A   As best I recall, I filed it and never heard
25     anything back.  Not even a rejection or

123

1      anything.
2  Q   Do you remember following up with anybody?
3  A   No.  At that point I simply had sort of given
4      up.
5  Q   Do you remember how long after the provost's
6      decision in May of 2017 that you applied for
7      that transfer?
8  A   Approximately the summer, that very summer,
9      2016.
10 Q   And you said that you did not apply for any
11     other Ph.D. programs?
12 A   Not after that, no.
13 Q   Why is that?
14 A   Getting into a Ph.D. program is difficult on its
15     own.  I did not particularly appreciate my
16     experience at IU.  I did not want to return to a
17     similar political climate.  Also, I would have
18     had to have foregone all credits I earned at IU
19     if I transferred.
20 Q   There's no transfer of credits from program to
21     program?
22 A   Well, simply, again, the structure of being a
23     Ph.D. student does not allow for that.
24 Q   So not even course credits can transfer?
25 A   Umm --

124

1  Q   Forgive me.  I just don't have an understanding
2      of the Ph.D. program.
3  A   Sure.
4         Generally, the way it works is that when
5      you apply to a Ph.D. program, you already have a
6      master's degree.  Schools will take
7      approximately 30 credits, which generally is all
8      of the master's coursework.  Anything beyond
9      that they will not take.
10         So if I were to apply to another Ph.D.
11     program, I would have to either forego all of my
12     master's credits or forego all of the credits I
13     accumulated at IU, either one of those two.  So
14     I would have to start from scratch again.
15 Q   So did you apply for jobs, then, after receiving
16     the provost's decision?
17 A   To my recollection, I took maybe a month or so
18     to collect myself, and then I began applying for
19     jobs.  Yes.
20 Q   I know you told me this before, but how long did
21     you remain in Bloomington before moving away?
22 A   I remained in Bloomington until May of this
23     year.
24 Q   This year.  Okay.
25 A   Yes.



125

1 Q   About a year after the provost's decision?
2 A   Yes.  My lease was not up yet, so I couldn't
3    really do anything about it.
4 Q   At that point in time, were you applying for
5    jobs just in Bloomington?
6 A   I believe I was applying for jobs both in
7    Bloomington and the surrounding area and also
8    back home in the New York City area.
9 Q   What types of jobs were you applying for?
10 A   Anything I felt I could do.  I was kind of
11    desperate at this point, so I wasn't being picky
12    at all.
13 Q   Were you trying to find something in your media
14    field?
15 A   If I could, yes, but again, I was just applying
16    for anything I thought I had the skill to do.
17 Q   Had you finished your Ph.D. program, what types
18    of jobs would that have lent itself to?
19 A   I would have gone into being a full-time
20    academic, a tenure-track position.  That would
21    have been what would be open to me.  It's
22    certainly what I would have pursued.
23 Q   Could there have been other professional jobs
24    that you would have been qualified for after
25    finishing your Ph.D.?

126

1 A   Think tanks certainly look very favorably on
2    Ph.D.s, consulting work, things of that nature.
3 Q   But at that time, you would have preferred to
4    stay in the academic setting; is that fair?
5 A   It would have been a preference, but I would not
6    have excluded think tank work or consulting
7    work.
8 Q   Sure.
9       Do you remember how long it took for you to
10    find your first job after IU?
11 A   The first job, I believe, was early to mid
12    September of 2016 -- no, wait.  2017.
13 Q   2017?
14 A   Yes.
15 Q   Right.
16       Was that a full-time job?
17 A   It was hourly.
18 Q   Did you work about 40 hours a week?
19 A   30 to 40, roughly, yes.
20 Q   How long did you keep that job for?
21 A   Until May 29th of this year -- excuse me --
22    April 29 of this year.
23 Q   That's when you moved away from Bloomington?
24 A   Yes.
25 Q   Was that job in Bloomington?

127

1 A   Yes, it was.
2 Q   What was the company?
3 A   I believe officially it's GIE LLC.
4 Q   What was your position there?
5 A   Initially dishwasher.
6 Q   Is this a restaurant?
7 A   Yes, it is.
8 Q   Go ahead.
9 A   That's like the incorporated name of the
10    restaurant.  The name of the restaurant is
11    Grazia.
12 Q   I'm assuming it's an Italian restaurant?
13 A   Yes, it is.
14 Q   Did you move into other positions while you were
15    employed there?
16 A   Eventually I was promoted to a position known as
17    garde manger, G-A-R-D-E M-A-N-G-E-R.
18 Q   What is that?
19 A   It's a line cook position that deals with,
20    specializes in cold foods, things that are
21    prepared or served cold.
22 Q   So in April or May 2018, you moved to Florida?
23 A   Mm-hmm.
24 Q   Where in Florida?
25 A   An unincorporated part of Sarasota County.

128

1 Q   Was that for a job or did you just want to?
2 A   It was an attempt to start fresh.
3 Q   Did you have a job lined up when you moved
4    there?
5 A   Did not.  No.
6 Q   Did you ultimately find one?
7 A   Did not.  No.
8 Q   How long were you in Sarasota?
9 A   Two and a half to three months, approximately.
10 Q   Did you apply for jobs down there?
11 A   Yes, I did.
12 Q   And then after those three months is when you
13    moved to New Jersey?
14 A   Yes.
15 Q   Did you move back to your hometown?
16 A   Yes.
17 Q   Where is that?
18 A   Cliffside Park.
19 Q   Is that close to New York City?
20 A   It's very close.  Yes.
21 Q   Are you currently employed?
22 A   I am not.  No.
23 Q   Have you had a job since moving back to
24    New Jersey?
25 A   I have not.  No.



133

1  A  Excuse me, yes.  Sanders might have sent it to
2     her.  I don't recall exactly, but yeah.
3  Q  Then on paragraph 36, it says "Robel's decision
4     explicitly referred to statements Calautti made
5     during the mediation hearing, which were
6     reported by Shanahan."
7        Do you see that?
8  A  Yes.
9  Q  How do you know she was referring to statements
10    reported by Shanahan when she received the
11    report from Steve Sanders?
12 A  Perhaps recognized them -- again that's the best
13    of my recollection -- and perhaps recognized
14    something in that report after reading it that
15    was from the mediation hearing.
16 Q  Something you would have said during the
17    mediation hearing?
18 A  Correct.
19 Q  Then going to the actual legal counts in your
20    complaints, the first one is free speech.
21 A  Mm-hmm.
22 Q  So paragraph 39, you say "In making his alleged
23    remarks," just that portion.  What alleged
24    remarks are you referring to here?
25 A  I didn't prepare his document, so my assumption

134

1     would be some or all of the quotes attributed to
2     me in Deposition Exhibit 1.
3  Q  So if you see the paragraphs 37 through 44, that
4     seems to be your free speech claim against Dean
5     Shanahan; is that right?
6  A  To the best of my knowledge, yes.
7  Q  So I'm reading this, and I see that it's focused
8     on these alleged remarks.  It doesn't really
9     talk about your articles or your -- the quote
10    from the article in The Chronicle of Higher
11    Education or your article in Vox.  So are those
12    articles part of your free speech claim as well?
13       MR. MEISENHELDER:  Again, I'm going to
14    object.  It calls for a legal conclusion.
15       But you can go ahead and answer the
16    question.
17 A  I guess I'll refer to points 12 and 13 of this
18    document.
19 BY MS. MACCHIA:
20 Q  So is that "yes" then?  They are part of your
21    free speech claim?
22       MR. MEISENHELDER:  Same objection.
23       Go ahead and answer the question.
24 A  I certainly have a right to express my political
25    opinion.

135

1  BY MS. MACCHIA:
2  Q  So just to kind of clarify why I'm asking these,
3     this is my only time to discover what your
4     claims are against the dean, IU, everybody else
5     that's mentioned in the complaint.  So I really
6     need to understand what is the basis of your
7     free speech claim so that I can defend my
8     clients properly, and so that I can advise them
9     properly when it comes time for a settlement or
10    anything like that.
11       So if you could articulate, in your own
12    words, what the basis for your free speech claim
13    is, that would be very helpful.
14 A  I'm not sure I understand what you mean by
15    "basis."
16 Q  All right.  Why did you bring a free speech
17    claim against the dean, Provost Robel, and the
18    board of review members?
19 A  Because I was terminated for speech.
20 Q  What speech?
21 A  Well, I believe what's stated in their
22    communications on this is my speech concerning
23    my Facebook profile.
24 Q  Any other speech that you're referring to?
25 A  Not that they cite, no.

136

1  Q  So is that the only speech, then, that your
2     First Amendment claim for free speech is based
3     on?
4  A  In my view, no.
5  Q  Okay.  So it would also be based on those
6     articles that were published?
7  A  I believe they certainly contributed to my
8     termination, but I don't believe they would be
9     so foolish as to come out and say that.
10 Q  Okay.  So to the extent you know, are you only
11    suing Dean Shanahan in his individual capacity
12    and not as a officer of the university?
13 A  It says right here "JAMES SHANAHAN, in his
14    individual capacity."
15 Q  So "yes"?
16 A  According to the document, yes.
17 Q  Same thing for the board of review members?
18    Individual capacity, not as representatives or
19    officers of the university?
20 A  No.  Actually, now that I read this, all of
21    these people mentioned would be both
22    individually and in their capacity --
23       Oh, no-no-no.  The SAA Board of Review
24    Members 1 through 6 would be in their individual
25    capacities.



137

1 Q   Then Provost Lauren Robel, she would be
2    individually and in her official capacity as an
3    official of the university?
4 A   Correct.  Yes.
5 Q   Great.
6       All right.  So then moving past the free
7    speech claims, your next group of claims,
8    Count IV, is based on a violation of due
9    process.
10      Do you see that on page 8?
11 A   Yes.
12 Q   Was your SAA appointment for more than one year?
13 A   The contract was for four years.
14      I should rephrase that.  The guarantee was
15    for four years.
16 Q   Where was that guaranteed?
17 A   Upon -- what do you mean "where"?
18 Q   Was it written somewhere?
19 A   It was communicated to me via email upon my
20    acceptance to IU.
21 Q   Did you provide that email to us in discovery?
22 A   (No response.)
23 Q   I'll represent to you that I've not seen that.
24 A   I do not believe so, then.
25 Q   Is that something you could provide to us?

139

1 Q   What department would that have been in?
2 A   Since this was the first year of The Media
3    School, I believe it would have been the
4    telecommunications department.  It had not yet
5    been administratively condensed --
6 Q   Merged.
7 A   -- into the -- exactly.
8       I think the heading would have been from
9    the Department of Telecommunications, something
10    along those lines.
11 Q   Okay.  I'll look for it too.  We can look at the
12    same time.
13      (Deposition Exhibit 20 was marked for
14    identification.)
15 Q   You've been handed what's been marked as
16    Exhibit 20.
17      Do you recognize this document?
18 A   I do.
19 Q   So at the top of this one, it says "Period of
20    Appointment --
21 A   Mm-hmm.
22 Q   -- Academic Year 2016 to 2017."
23 A   Mm-hmm.
24 Q   Do you see where that is?
25 A   I do.

138

1 A   I don't know.  I would have to look at my email.
2 Q   Do you still have the same email address or
3    access to that email account it would have gone
4    to?
5 A   In all likelihood, yes, but perhaps that email
6    would be difficult to find.  It would have been
7    sent to my personal email account.  It's got
8    thousands of emails in there.  Most of the
9    emails -- not "most" -- some portion of the
10    emails I provided during discovery were from my
11    IU email account.  Then it's much easier to get
12    all the relevant information for because it's
13    all collected in one place.  So that account is
14    still active and I still have access to it
15    but --
16 Q   Do you mind checking, after today, if you can
17    find that email?
18 A   Certainly, yes.
19 Q   Is that the only place where it would say that
20    it was four years guaranteed, or did you receive
21    anything else in writing to that effect?
22 A   Not that I can recall, but I'm fairly certain
23    the university would have a copy of this anyway.
24 Q   Do you remember who sent you the email?
25 A   One of the department secretaries, I believe.

140

1 Q   Did you receive one of these for 2015 to 2016 as
2    well?
3 A   I did.
4 Q   Is it your understanding then, based on
5    receiving these agreements and then the
6    guarantee that was provided to you via email,
7    that it was a four-year guarantee in one-year
8    blocks?
9 A   I don't believe that was the phrasing
10    communicated to me in that email.
11 Q   Okay.  Would Exhibit 20, the agreement for SAA,
12    would that show that it was for a one-year
13    block, academic year 2016 to 2017?
14 A   This particular document does say that, yes.
15 Q   So then turning back to Exhibit 19 --
16 A   Mm-hmm.
17 Q   -- if you go to page 8, it's paragraph 61.
18 A   Mm-hmm.
19 Q   It says "Defendants' use of statements Calautti
20    made during mediation, despite the
21    confidentiality required of mediation
22    discussions, deprived Calautti of his right to
23    due process, as guaranteed by the Fourth
24    Amendment."
25 A   Fourteenth Amendment.



141

1 Q  "Fourteenth Amendment." Yes.
2      Do you see that?
3 A  Yes, I do.
4 Q  So besides the use of statements in the
5    mediation panel discussions, are there any other
6    conduct or acts that you are saying violated
7    your due process rights?
8      MR. MEISENHELDER:  Again, I'm going to make
9    the same objection.
10     But go ahead and answer the question.
11 A  I don't know.  I don't understand that question.
12 BY MS. MACCHIA:
13 Q  How were your due process rights violated, in
14    your words?
15 A  Beginning with the OSE hearing, it followed
16    no -- no procedures of due process whatsoever as
17    outlined by the State of Indiana or the federal
18    government.  It's structured -- again, it's sort
19    of a quasi-legal thing, but I'm not allowed to
20    have a lawyer act on my behalf.  I'm not allowed
21    to face my accuser and take evidence brought
22    against me and take that evidence.  I'm not --
23     There's very specific and extreme
24    constraints placed upon me that would not be
25    placed on me if this was a matter in federal or

142

1    state court.  I'm limited on how many witnesses
2    I'm allowed to bring.  I forgot what that number
3    is, but it was very small.  I think it was one
4    to three or something like that.
5     The standard of judgment is preponderance
6    of the evidence and not beyond a reasonable
7    doubt.  So any number of things there, I think,
8    violated due process or the due process I would
9    be afforded if this was an actual legal matter.
10 Q  So is it your belief, then, or position that a
11    university's procedures for dealing with
12    grievances associated with academic appointments
13    or other employment matters should mirror what's
14    afforded federally and in a state court
15    proceeding?
16 A  I believe that any institution that is funded by
17    a state or federal entity certainly has to
18    follow those things, yes.
19     A private company can do whatever they
20    want --
21 Q  Sure.
22 A  -- within the legislative boundaries well
23    established.
24 Q  So am I accurate -- and if I'm not, tell me,
25    obviously -- in summarizing your due process

143

1    violations that you're alleging, as IU's
2    procedures that they have in place for
3    grievances that you filed and its failure to
4    adhere to their process?
5 A  It's both the nature of the restrictions placed
6    upon the entire process, both the student and as
7    an employee, as well as the fact that they
8    violated their own procedures.
9 Q  You said it way better than I did.
10 A  Thank you.
11 Q  So the provost, I know you also sued her in her
12    individual capacity.  So how did she
13    specifically violate your due process rights?
14     MR. MEISENHELDER:  Same objection.
15 A  Well, she was the former dean of the law school
16    and I assume, therefore, has a degree in law and
17    would be knowledgeable of the law and simply
18    went along.  She was in a position to stop this
19    if she saw it as I did.  She did not have to
20    agree with the recommendation of the board of
21    review.  So she did not.  She decided to uphold
22    the termination.
23 BY MS. MACCHIA:
24 Q  So would you say it's because she basically just
25    kind of let the process happen instead of giving

144

1    you rights you believe you deserved to have?
2 A  Well, that, as well as -- I mean, I would have
3    to look back through all of these exhibits.  But
4    in her formal statement to me, certainly
5    upholding my termination, she does make
6    evaluative opinion judgments of me.  So she's
7    not really just going by the facts presented for
8    her.  She's sort of questioning who I am as a
9    person and so on.
10 Q  Do you think that questioning you how you are as
11    a person, that violates your due process rights?
12 A  Can you rephrase that question.
13 Q  Sure.  You said she made an evaluative opinion,
14    basically, on you as a person?
15 A  Mm-hmm.
16 Q  Does that conduct violate your due process
17    rights, in your mind?
18 A  I mean --
19 Q  I'm not trying to test you or anything.
20 A  I know.  Yeah.  I don't mean to stall or
21    anything.
22 Q  No, no, no.  You're fine.  Take your time.
23 A  I'm trying to formulate an answer.  Let's see.
24     I don't believe, for example, that
25    someone's personal outrage or offense



145

1   constitutes a reason to cite my speech as a
2   reason for why I'm being terminated.
3 Q   Okay.  Flipping to still Exhibit 19, page 10,
4     there's a section called "Relief Requested,"
5     which essentially lists out damages.
6 A   Mm-hmm.
7 Q   So I just am going to ask you about a couple of
8     them.  So it says, let's see, paragraph 74 is
9     for lost wages.
10 A   Mm-hmm.
11 Q   Do you have an amount calculated for your lost
12     wages?
13 A   Does wages include all compensation?
14 Q   That would be my question to you.  Would it be
15     wages and benefits? wages and other things?
16 A   Because the structure of it, all of my
17     compensation, you know, it's one thing.  So yes,
18     it would include health insurance, tuition
19     waiver, and all of that.
20 Q   As well as that 13,000 stipend?
21 A   As well as a small stipend, yes.
22 Q   Okay.
23 A   And the figure would be approximately $125,000.
24     That would be the value of all of those things
25     put together for the remainder of my contract or

146

1   my guarantee.
2 Q   Which would have been an additional two years;
3     is that right?
4 A   Yes.
5 Q   And then the next paragraph, 75, it says "other
6     financial losses."
7     Do you see that?
8 A   Mm-hmm.
9 Q   Do you know right now what other financial
10     losses you would have been referring to or that
11     you would like to recover?
12 A   Certainly, lifetime loss of income and that sort
13     of thing, that's a loss.
14 Q   In calculating that, would you use the salary
15     and benefits of a tenured professor?
16 A   A tenure-track professor, yes.  A lifetime
17     average.
18 Q   When you say "lifetime," would that be up until
19     like retirement age?
20 A   I would take an average of, you know, what they
21     would start at and what they would end at.  So
22     obviously, you'd be making way more at the end
23     of your career than at the beginning.  So
24     averaging that over 30-some-odd years, I would
25     be employed as a tenure-track or tenured

147

1   professor, that's a pretty reasonable average, I
2     would say.
3 Q   You can put that one down.  Those are the only
4     ones I wanted to clarify.
5     (A discussion was held off the record.)
6     (Deposition Exhibit 21 was marked for
7     identification.)
8 BY MS. MACCHIA:
9 Q   You've been handed what's been marked as
10     Exhibit 21.  This is a document that's filed in
11     litigation by each party.
12     Have you seen this before?
13 A   I don't believe so.
14 Q   So then I'm going to still ask you a couple
15     questions about things in it, but if you don't
16     know just let me know you don't know.
17     It's going back to page 3, there's a
18     Section C, "Calculation of Damages."
19 A   Yes.
20 Q   So the first sentence under Lost Wages.
21 A   Mm-hmm.
22 Q   It says that your SAA contract guaranteed you
23     three years' employment.
24     Is that a mistake?
25 A   I believe so.  It should be four years.

148

1 Q   Okay.  Then in terms of benefits, was it just
2     health insurance that was the extra benefit
3     provided by IU?
4 A   Health and dental together is one thing.  Yes.
5     There's smaller, you know, supplemental things.
6     Like I had free access to academic databases and
7     that kind of thing, much smaller things.  But
8     the bulk of the compensation would be the
9     stipend, the health insurance, and the tuition
10     waiver.
11 Q   Was your health insurance fully subsidized by IU
12     then?
13 A   It had a small co-pay for certain things.
14 Q   But you didn't have to pay any portion of the
15     premium?
16 A   No, I don't believe so.
17 Q   You can put that one down.  That's all I wanted
18     to clarify on that one.
19     (Deposition Exhibit 22 was marked for
20     identification.)
21 Q   You're being handed what's been marked as
22     Exhibit 22.
23 A   Mm-hmm.
24 Q   This appears to be a copy of your answers to
25     interrogatories.



149

1        Does that sound right to you?
2  A  It does, yes.
3  Q  Have you seen this before?
4  A  Umm --
5  Q  This is just another discovery document.
6  A  I provided this information to my attorney, and
7     he put it in this format.  But the bulk of the
8     information here, all of it is provided by me,
9     yes.
10 Q  I'm going to point you to page 8,
11    Interrogatory No. 12.
12 A  Yes.
13 Q  It says in your answer "I am indeed claiming
14    that I have suffered emotional and psychological
15    injuries or symptoms as a result of the
16    allegations."
17 A  Mm-hmm.
18 Q  What emotional and psychological injuries or
19    symptoms are you referring to?
20 A  Okay.  I've been diagnosed with dysthymic
21    depression.  I believe you have access to my
22    medical records, so that's publicly in there.
23 Q  Was that diagnosis prior to your termination
24    from IU?
25 A  It was as a result of what was happening to me

150

1     in graduate school, but it was prior to the
2     termination but --
3  Q  What do you mean "as a result of what was
4     happening to you in graduate school"?
5  A  Sort of the ostracization I was being exhibited
6     to -- being exhibited by for my political and
7     social beliefs.
8  Q  Was that among students too?
9  A  Yes.
10 Q  Did you feel that other faculty members, I
11    guess, negatively treated you because of
12    political views?
13 A  I will say that faculty had treated me fairly,
14    as a student, but probably not so fairly outside
15    of that context.  They had no obligation to
16    treat me fairly outside of the context of being
17    a student anyway.  So credit where credit's due,
18    they didn't --
19 Q  You didn't get negative marks or anything?
20 A  Right.  Exactly.
21 Q  What about when you were a grad student or
22    master's student in Tennessee?  Did you feel the
23    same kind of ostracization or anything?
24 A  No.  Actually, my experience there was quite
25    pleasant.  I mean, it was known that I was right

151

1     of center, as well, there and everyone else
2     wasn't, but I never really felt any of that sort
3     of stuff there.
4  Q  So when you say "through your graduate studies,"
5     you're simply talking about at IU?
6  A  Yes.
7  Q  I just wanted to clarify that.
8  A  No problem.
9  Q  Any other diagnoses besides depression?
10 A  No diagnoses, no.
11 Q  Well, actually, you know, if you turn the page
12    to page 9, there's a list of conditions,
13    symptoms, if you want to just kind of look
14    through those real quick.
15 A  Yes.
16 Q  Anything else that's not listed here?
17 A  No.  That's a fairly accurate summary.
18 Q  Okay.  Great.
19        Any of these conditions -- and we don't
20    have to go one by one -- but collectively, did
21    you experience any of these prior to your
22    termination?
23 A  Some, yes, but they would be tied to the
24    depression, for example, difficulty sleeping,
25    difficulty getting out of bed, reclusiveness to

152

1     a certain degree.  But some of them were new
2     afterwards.
3  Q  Can you tell me which ones were new as of your
4     termination?
5  A  Okay.  The weight loss/weight gain; the
6     physiological responses (high blood pressure,
7     rapid heartbeat, nausea, blunted affect);
8     inexplicable anger at friends/family; loss of
9     libido; loss of friends/family, that is
10    certainly one that was tied exclusively to this;
11    and the final one, yes.
12 Q  Are you today still experiencing any of those
13    six that you just named are listed?
14 A  Let's see here.  Four and six.
15 Q  Which two are you not?  That's the easier one.
16 A  My weight has stabilized at around 168 to 170
17    pounds, and I'm no longer having high blood
18    pressure issues or rapid heartbeat issues.
19    Nausea and blunted affect are still kind of
20    there though.
21 Q  Have you ever taken medication for depression?
22 A  No.  It was offered by my therapist, but I
23    declined.
24 Q  Did you continue to see a therapist after
25    leaving IU?

