**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| PETER CALAUTTI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00119-TWP-DML |
| | ) | |
| JAMES SHANAHAN in his individual capacity, | ) | |
| LAUREN K. ROBEL individually, and in her | ) | |
| official capacity as Provost of Indiana University, | ) | |
| Bloomington, SAA BOARD OF REVIEW | ) | |
| MEMBERS ONE, TWO, THREE, FOUR, FIVE | ) | |
| AND SIX in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants James Shanahan in his individual capacity ("Dean Shanahan"); Lauren K. Robel, individually and in her official capacity as Provost of Indiana University, Bloomington ("Provost Robel"); and SAA Board of Review Members One, Two, Three, Four, Five, and Six in their individual capacities ("SAA Board Members") (collectively, the "Defendants") ([Filing No. 41](#)). Plaintiff Peter Calautti ("Calautti") brought this action alleging violation of his First Amendment right to free speech and Fourteenth Amendment due process rights, pursuant to 42 U.S.C. § 1983. Calautti did not file a response to the Defendants' Motion for Summary Judgment. For the reasons stated below, the Defendants' Motion for Summary Judgment is **granted**.

## I.     LEGAL STANDARD

A motion for summary judgment asks that the court find that a trial based on the uncontroverted and admissible evidence would—as a matter of law—conclude in the moving party's favor and is thus unnecessary. *See* Fed. R. Civ. P. 56(c). When evaluating a motion for

summary judgment, the court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial … against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. 317. The key inquiry is the existence of evidence to support a plaintiff's claims or defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999).

When a party offers no response to a motion for summary judgment, the Court will treat the moving party's supported factual assertions as uncontested. Ind. S.D. L.R. 56-1(b); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). The entry of summary judgment is not automatic, however, and may only be granted when the undisputed facts lead to judgment as a matter of law. *O'Brien v. Moores*, 784 F. Supp. 2d 1054, 1055 (S.D. Ind. 2011).

Because Calautti did not respond to the Defendants' Motion for Summary Judgment, the Court must treat Defendants' supported factual assertions as uncontested.

## II. <u>BACKGROUND</u>

### A. <u>Calautti's Position at IU and His Facebook Post</u>

In the fall of 2015, Calautti enrolled as a Ph.D. student in the inaugural class at Indiana University's ("IU") Media School. ([Filing No. 43-1 at 4](#).) During his time, he was also was employed as a student academic appointee ("SAA"). *Id.* at 5-6. SAAs work either as teaching assistants or research assistants for professors. *Id.* at 5. During the 2015-2016 academic year,

Calautti was a teaching assistant in two separate courses. *Id.* As an SAA, Calautti received a tuition waiver, a stipend, and health insurance benefits. *Id.*

On May 20, 2016, Mohammed Bagha ("Bagha"), a person not affiliated with IU, sent an e-mail addressed to James Shanahan, the Dean of IU's Media School, "to discuss and express concerns" about Calautti. (Filing No. 43-2; Filing No. 43-3.) Bagha wrote that "Calautti has repeatedly expressed racist views & threatened violence against myself, my family (including my children), and others on social media." (Filing No. 43-3.) The e-mail included multiple screenshots which depicted racist and threatening statements allegedly made by Calautti on social media. *Id.* One screenshot showed that Calautti had posted the following message to Bagha on Facebook:

> Don't forget about forcing you to watch as I beat your shitskin children into being wheelchair bound, brain damaged, drooling drones.
>
> PS – You still live in a small town and you and your kin have a rather unusual last name. Watch out.

*Id.* at 2. Calautti originally denied posting the message during IU's investigation, but later admitted that he authored the Facebook message during a deposition conducted for this litigation. (Filing No. 43-1 at 6-7.) Calautti did not accept or deny responsibility for other offensive posts he was shown that appeared to have been posted by his Facebook account, saying he did not recall whether he had posted them or that the screenshots "could have easily been altered." *Id.* at 7.

When he received Bagha's e-mail, Dean Shanahan immediately notified Chief Laury Flint of the Indiana University Police Department ("IUPD") and asked her thoughts on how he should proceed. (Filing No. 43-2 at 2; Filing No. 43-4.) Chief Flint responded that Calautti had "crossed the line from expression to intimidation" and that IUPD wanted to take a report from Bagha. (Filing No. 43-5.) Dean Shanahan relayed that information to Bagha and provided him with IUPD's contact information, but Bagha did not come forward to make a police report. (Filing No. 43-6.) Therefore, IUPD was never able to pursue criminal charges against Calautti. (Filing No. 43-7.)

On July 25, 2016, Dr. Andrew Weaver, the Director of Graduate Studies for the Media School, forwarded Bagha's email to Carol McCord, who was IU's Associate Dean of Students and Title IX Deputy Coordinator at the time. ([Filing No. 43-8 at 1-2](#); [Filing No. 43-9](#).) After receiving that email, IU's Office of Student Ethics ("OSE") initiated an internal investigation into Calautti's Facebook post. ([Filing No. 43-2 at 2](#); [Filing No. 43-8 at 2](#).) On August 11, 2016, Dr. Weaver emailed Calautti to notify him that his SAA position for the fall semester "likely will be with a specific faculty member rather than a teaching assignment" and informed him that he would have more details soon. ([Filing No. 43-8 at 2](#); [Filing No. 43-10](#).) In the same email, Dr. Weaver wrote, "On a somewhat related note, some potentially problematic information coming from a social media account of yours has come to the attention of the Dean of Students office." *Id.* The email notified Calautti that the Dean of Students Office would like to meet with him and Dr. Weaver. *Id.*

For the beginning of academic year 2016-17, Calautti was assigned to a research position with Dr. Stephanie De Boer, an associate professor in the Media School. ([Filing No. 43-8 at 2](#); [Filing No. 43-11](#).) The Deans at the Media School chose to place Calautti in a research position as opposed to a teaching position while the investigation of Calautti's Facebook post was pending because they were concerned that he posed a risk to student safety. ([Filing No. 43-8 at 2](#).) On August 22, 2016, Calautti signed an Application and Agreement for Student Academic Appointee ("Agreement") accepting a SAA position for the 2016-17 academic year. ([Filing No. 43-12](#).) The Agreement stated that IU made no commitment to reappoint Calautti after academic year 2016-17. *Id.*

## B.    The Office of Student Ethics Conduct Hearing

On August 18, 2016, Elizabeth Spotts ("Spotts"), who was serving as the Interim Director of the OSE, sent Calautti a letter explaining that he was being charged with three violations of the

Code of Student Rights, Responsibilities, and Conduct and the Apartment/Residence Halls Rules and Regulations. (Filing No. 43-13.) The letter set forth the allegations against Calautti and notified him that a conduct hearing would take place on August 23, 2016. *Id.* Calautti requested more time to prepare for the hearing, which the OSE granted. (Filing No. 43-1 at 9-10.) Calautti requested the opportunity to review the contents of the OSE's case file prior to the conduct hearing, and that request was granted. *Id.*

The OSE conduct hearing occurred on September 1, 2016. (Filing No. 43-14.) During the hearing, Calautti called a witness, an acquaintance he met on the internet who appeared via videoconference. *Id.* Calautti admitted that he was responsible for the comments charged to him but that he made the comments in response to inflammatory comments made by Bagha. *Id.* Calautti mainly defended his actions and comments but did eventually express regret about the way he handled the situation, saying "I probably could have used better terms." *Id.* at 4.

On September 6, 2016, Spotts informed Calautti by letter that she had determined he was responsible for one violation of the Code of Student Rights, Responsibilities, and Conduct— Personal Misconduct Not on University Property. (Filing No. 43-15.) As a result, Calautti was given a deferred suspension, was required to schedule an appointment with a counselor, and was required to attend a closure meeting with Spotts at the end of October. *Id.* Calautti had the opportunity to appeal that decision but chose not to because he thought it was "essentially a nonpunishment." (Filing No. 43-1 at 13.)

### C.    Dean Shanahan's Decision to Terminate Calautti's Employment

On September 13, 2016, Calautti met with Dean Shanahan and Dr. Weaver to discuss the impact of his Facebook post on his employment as an SAA. *Id.* at 9; Filing No. 43-2 at 2. The OSE process only disciplined Calautti in his capacity as an IU student, but it was up to Dean Shanahan

and Dr. Weaver to discipline him as a teacher's assistant or research assistant. During the meeting, Dean Shanahan showed Calautti the Facebook post again and explained to him that it could be a terminable offense. (Filing No. 43-1 at 15-16; Filing No. 43-2 at 2.) When asked to explain the circumstances surrounding the post, Calautti neither admitted or denied that he made the post, he merely referred Dean Shanahan to the statements he made to Spotts during his OSE hearing. (Filing No. 43-1 at 9, 15-17.)

On October 5, 2016, Dean Shanahan notified Calautti by email and letter that his position with the Media School would be terminated at the end of the fall 2016 academic semester for conduct that is "at severe variance with that normally expected of University appointees." (Filing No. 43-16.) Dean Shanahan provided a two-page letter explaining his decision, which read in part:

> We also talked about the various documents that had been sent to me, and you claimed most of them were faked and perhaps photoshopped. However, I asked you about one specific set of threats, and you did not deny that you said those things. You seemed to take care neither to confirm nor deny that the threats were from you, but you also made the argument that if you did make those threats, they were "undeliverable" and therefore not real threats.
>
> First, you failed to convince me that the threats were not from you. Second, even if they were "undeliverable," they are the sort of behavior that we cannot have from our employees. The Media School must have confidence that its graduate students can perform their classroom duties in a competent and fair manner with respect to all of our students. I myself use the criterion of whether I can justify to parents of our undergraduate students why we have placed individuals as instructors in the classroom. Whether it is logistically possible that you could have carried out your threat is of less interest to me, although I think any reasonable person would find your words to be a real and meaningful threat. It is more the lapse of judgment and willingness to engage in repugnant, worrisome, and unprofessional rhetorical pyrotechnics that convinces me that I should act to terminate your academic appointment in our School. I note that the deferred suspension imposed against you by the Office of Student Ethics means there is a definite finding that these threats were not acceptable, and that future similar behavior on your part would result in your immediate suspension from IU.
>
> On that point, you affirmatively misrepresented the outcome of your hearing with the Office of Student Ethics. You asserted in your email to Dr. Weaver that "no action will be taken" by them and that the Student Ethics process was resolved. In fact, disciplinary action in the form of a deferred suspension had already been taken.

In our meeting, you continued to push your position that OSE had taken no action and that there should be no repercussions related to your academic appointment at the Media School. This is not, however, an accurate representation of OSE's findings. OSE found you responsible for "Personal Misconduct Not on University Property," and imposed a sanction of a deferred suspension. Deferred suspension is not "no action"; in fact, a deferred suspension is a very significant sanction in that any further infractions would result in an immediate suspension from IU. Your dismissive attitude shows, at best, a lack of awareness of the seriousness of OSE's finding and sanction and, at worst, a deliberate attempt to deceive the School. Neither is acceptable.

Finally, let me note that The Media School stands strongly for free speech and freedom to hold political views of any stripe. However, graduate students with academic appointments in our School must be able to perform the work of teaching and grading a very diverse undergraduate student population fairly and without bias. Your ability to perform those essential functions of your position has been irretrievably compromised.

(Filing No. 43-16 at 2-3.)

### D. Calautti's Appeal

On October 11, 2016, Calautti appealed that decision to a mediation panel. (Filing No. 43-1 at 18; Filing No. 43-19.) The mediation panel consisted of three faculty members from the Bloomington Faculty Council Student Affairs Committee and two graduate students. (Filing No. 43-20.) One of the faculty members, Steve Sanders, served as the chair of the mediation panel. (Filing No. 43-1 at 19.) Both Calautti and Dean Shanahan provided written statements to the panel before the mediation. (Filing No. 43-19; Filing No. 43-2 at 3.) Calautti met with Sanders prior to the mediation to explain his position and the circumstances of his appeal. (Filing No. 43-1 at 19.)

The mediation was conducted on November 18, 2016. *Id.* It lasted approximately two hours, and during that time Calautti was given an opportunity to state his case again. *Id.* On November 28, 2016, the mediation panel issued its written recommendation. *Id.* at 20; Filing No. 43-20. The panel recommended the parties attempt to find an alternative to termination and suggested increased oversight of Calautti while he continued his teaching responsibilities. (Filing No. 43-20 at 3.) The panel also suggested Calautti sign his name to certain assurances: "He would

write and sign a statement unequivocally reaffirming what he maintained to our panel: that he did not write the posting that Dean Shanahan singled out as the basis for the termination decision. Should evidence ever come to light that proves otherwise, it would demonstrate bad faith and justify Calautti's termination." *Id.* at 4.

On December 6, 2016, Calautti informed Sanders that he agreed to the conditions of the panel's report. (Filing No. 43-21.) But on December 9, 2016, Dean Shanahan emailed Calautti to say that he would not accept the panel's proposal, that his employment would end the following week, and that Calautti had the right to appeal his decision with the SAA Board of Review (the "SAA Board"). (Filing No. 43-22.) Calautti did appeal Dean Shanahan's decision to the SAA Board on December 14, 2016. (Filing No. 42 at 10.) Sanders assisted Calautti in writing his appeal, and a student at IU Maurer School of Law, Jeff Soller, worked with Calautti during his appeal and represented him at the hearing before the SAA Board. (Filing No. 42 at 10.)

Despite admitting to Spotts at his OSE hearing that he had written the Facebook post that ultimately resulted in his termination, Calautti maintained throughout his appeal with the SAA Board that the post was falsely attributed to him or fabricated entirely. (Filing No. 43-23 at 1-2). However, in the deposition he gave in this litigation and in his answer to Defendants' interrogatories, he admitted that was a lie:

> Q:   Why did you take the position now, with the board of review, that that top statement on page 2 of Exhibit 1 was falsely attributed to you when, prior to that, you had admitted making the posting?
>
> A:   Simple desire to preserve my job, I presume. I didn't think that I would get a fair hearing in any of this process whatsoever after my experience at the Office of Student Ethics, and I thought it was the best course of action at the time.
>
> Q:   Okay. So is it safe to say it was a lie?
>
> A:   Yes.

([Filing No. 43-1 at 23](#), [Filing No. 43-24 at 17](#) ("I admitted to Libby Spotts that I had authored the so-called 'threat' in an angry response to Bagha's ethnic and religious slurs. When I realized that Dean Shanahan was trying to terminate me from my teaching position, I referred to the threat as though it was one of the fabrications.").) Dean Shanahan also submitted a written memorandum to the SAA Board. ([Filing No. 43-32](#).) On February 22, 2017, Calautti submitted a written response to Dean Shanahan's memorandum. ([Filing No. 43-25](#).)

The SAA Board held a hearing on March 2, 2017. ([Filing No. 43-2 at 3](#).) During the hearing both sides made opening statements and Calautti answered questions from the SAA Board and presented one witness—Thomas French—a faculty member at the Media School for whom Calautti had served as teaching assistant. ([Filing No. 43-1 at 25-26](#).) Calautti generally felt that he had the opportunity to present his side of the story at the hearing. *Id.* at 26-27.

On April 11, 2017, the SAA Board recommended to Provost Lauren Robel that she uphold Dean Shanahan's decision to terminate Calautti. ([Filing No. 43-26](#).) Calautti sent an email to Provost Robel urging her to consider what he felt were "procedural irregularities" in his disciplinary process. ([Filing No. 43-27](#).) On May 15, 2017, Provost Robel notified Calautti of her decision to uphold his termination as an SAA. ([Filing No. 43-28](#).) Concluding her five-page decision, Robel wrote:

> Dean Shanahan found the threats at the center of this case shocking and believable—beyond anything he had seen or heard in thirty years in academics and at "severe variance" with the obligations of a student academic appointee. A reasonable person receiving these threats would have believed them to be credible, specific, and frightening, and based on the totality of the record, I believe Mr. Calautti intended these statements as the threats that they blatantly are. The Dean was entitled to relieve Mr. Calautti of his appointment as a result.

*Id.* at 6.

Calautti stayed at IU to finish his courses for the 2016-2017 academic year while his appeal was pending. ([Filing No. 43-1 at 6](#).) Although Calautti did not have an SAA assignment during

the spring 2017 semester, he received a tuition waiver, stipend, and his health insurance was provided throughout the remainder of that academic year. *Id.* Calautti did not return to IU for the 2017-18 academic year and has not applied to any other Ph.D. program at IU since leaving the university. *Id.* at 30-31.

Calautti filed this lawsuit on January 13, 2018, alleging two claims, violation of free speech and violation of due process, both arising under 42 U.S.C. § 1983. ([Filing No. 1](#).) The Defendants moved for summary judgment on January 25, 2019, which meant Calautti had until February 22, 2019 to respond. ([Filing No. 41](#).) February 22, 2019 came and went without word from Calautti or his counsel, but on February 26, 2019 his counsel filed an "emergency" motion for extension of time, asking to have until March 26, 2019, to file a response. ([Filing No. 49](#).) This Court denied that motion, finding that the record demonstrated neglect by Calautti's counsel and "overlooking the failures under all the circumstances of this case … would stretch the bounds so far as to engender disrespect for the rules and procedures of the court." ([Filing No. 51](#).)

### III.   DISCUSSION

Calautti argues that the Defendants violated both his First Amendment right to free speech and his Fourteenth Amendment right to due process. ([Filing No. 1](#).) Defendants have moved for summary judgment, arguing that Calautti's claims are barred by sovereign immunity and qualified immunity. ([Filing No. 42](#).)

### A.   Sovereign Immunity

The Eleventh Amendment grants states immunity from private suits in federal court without their consent. *Nuñez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016). An agency of the state receives this same immunity. *Id.* Agency principals sued in their official capacity—here Provost Robel—are "entitled to assert Indiana University's Eleventh Amendment

immunity because they are being sued in their 'official capacities.'" *Shannon v. Bepko*, 684 F. Supp. 1465, 1473-74 (S.D. Ind. 1988). Citing this and other Seventh Circuit law, Defendants argue that "Calautti's claims against Provost Robel in her official capacity for any relief other than prospective injunctive relief are barred." ([Filing No. 42 at 13](#).) The Court agrees, and for that reason Calautti's § 1983 claims against Provost Robel in her official capacity is **dismissed**.

Defendants argue that Calautti's individual-capacity claims are also barred by sovereign immunity because those claims are not bona fide individual-capacity claims, but instead "seek relief 'that would expend itself on the public treasury.'" *Id.* at 14 (quoting *Harden v. Bd. of Trs. Of E. Ill. Univ.*, No. 12-CV-2199, 2013 WL 6248500, *9 (C.D. Ill. Dec. 2, 2013)). Defendants contend that Calautti "seeks damages for economic losses from Defendant arising out of an employment relationship" and that any money judgment granted by this Court would reduce the amount of money in IU's coffers, not the pockets of the individual Defendants.

The U.S. District Court for the Northern District of Indiana recently rejected a similar argument made by Indiana University at South Bend. *Reinebold v. Ind. Univ. at S. Bend*, No. 3:18-CV-525, 2019 WL 1897288 (N.D. Ind. Apr. 25, 2019). An applicant to be the University's baseball coach brought an age-discrimination suit against the school and two school officials who passed him over for the job. Although the court recognized the Seventh Circuit's rule that individual-capacity suits that in effect ask for relief from the State can be barred by sovereign immunity, it found that, at the summary judgment stage of litigation, "nothing indicates that a judgment in Reinebold's favor would 'flow from the state treasury'" instead of the pockets of the two school officials who made the decision not to offer Reinebold the job. *Id.* at *2. In making that finding, the court stressed that Reinebold's complaint sought both compensatory and punitive damages from the defendants in their individual capacities. *Id.* at *3.

Calautti's complaint is similar to Reinebold's. Although he asks for damages that would unquestionably be paid by IU, such as "all lost wages resulting from the Defendants' illegal termination," his complaint also explicitly demands damages that the Defendants would be liable for individually. (Filing No. 1 at 10.) Calautti asks the Court to order the individual defendants, jointly and severally, to "pay Calautti any and all other financial losses incurred as a result of the Defendants' unlawful actions," to "pay Calautti compensatory damages for their unlawful actions," and to "pay Calautti punitive damages for their intentional, willful actions." *Id.* Nothing at this stage of litigation indicates these pleas for damages, if granted, would be paid by IU rather than the individual defendants. Therefore, Calautti's individual-capacity claims are not barred by sovereign immunity.

**B.** **Qualified Immunity**

Defendants assert that they are protected from Calautti's individual-capacity claims by qualified immunity. (Filing No. 42 at 14-15.) Qualified immunity protects government officials from liability "when they act in a manner that they reasonably believe to be lawful." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). Put another way, government officials performing discretionary functions are entitled to qualified immunity if their conduct could reasonably have been thought consistent with the rights they are alleged to have violated. *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) (citing *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013 (7th Cir. 2006)). Qualified immunity not only protects from liability, but also from the burden of standing trial. *Id.* As such, "courts should determine as early on in the proceedings as possible whether a defendant is entitled to qualified immunity." *Id.*

When presented with a qualified immunity defense, the court must first "(1) determine whether the plaintiff has alleged the deprivation of an actual constitutional right and, (2) if so,

determine whether that right was clearly established at the time of the alleged violation." *Sparing v. Village of Olympia Fields*, 226 F.3d 685, 688 (7th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Although qualified immunity is an affirmative defense, the burden of defeating an assertion of qualified immunity rests with the plaintiffs. *Id.* (citing *Spiegel v. Cortese*, 196 F.3d 717 (7th Cir. 1999)). Accordingly, Calautti bears the burden of showing that the constitutional right allegedly violated was clearly established before his employment was terminated by offering either a closely analogous case or evidence that the Defendants' conduct so patently violated the constitutional right that reasonable officials would know so without guidance from the courts. *Gossmeyer v. McDonald*, 128 F.3d 481, 496 (7th Cir. 1997) (*Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir. 1993)).

The "clearly established" standard requires the contours of the right to be sufficiently clear such that a reasonable official would understand that what he is doing violates that right. *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999); *Doe v. Bobbitt*, 881 F.2d 510, 511 (7th Cir. 1989). In ascertaining whether a particular right has been "clearly established," the Seventh Circuit looks either to binding precedent from the United States Supreme Court or this Circuit or, in the absence of controlling authority on point, such a clear trend in the case law that the recognition of the right by controlling precedent was merely a question of time. *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994).

Defendants argue "there is no evidence that any of the Defendants sued in their individual capacities—Dean Shanahan, the SAA Board of Review Members, and Provost Robel—engaged in conduct that violated a clearly established free speech and/or due process right of Calautti." (Filing No. 42 at 15.) Defendants contend that each individual "properly and fairly performed his or her role in Calautti's termination and appeal processes." *Id.* Defendants also argue that the

Facebook post does not constitute protected speech and that Calautti was afforded a full and fair grievance process. *Id.*

The Court is persuaded that all individual defendants acted reasonably when fulfilling their roles in Calautti's termination and had no reason to believe their conduct violated his clearly established constitutional rights. Dean Shanahan decided to terminate Calautti not on the basis of the Facebook post alone, but for an array of other reasons. After receiving word of the Facebook post, he interviewed Calautti, but found Calautti, who would neither confirm nor deny that the he had made the threat, to be evasive. He took umbrage at Calautti for misrepresenting the outcome of his disciplinary process in the Office of Student Ethics, which resulted in a deferred suspension, but which Calautti told a supervisor had resulted in no disciplinary action. Dean Shanahan noted that Calautti had compromised his ability to do his job without bias and that it would be difficult to explain Calautti's presence in a classroom to the parents of students taking that class. (Filing No. 43-16 at 2-3.) It is clear that Dean Shanahan terminated Calautti's employment not merely due to the threatening Facebook post, but also because when confronted with the post, Calautti lied, omitted facts, and misrepresented the outcome of another disciplinary hearing. It was reasonable for Dean Shanahan to believe that terminating Calautti under those circumstances would not violate any of Calautti's clearly established constitutional rights.

Moreover, even if Dean Shanahan had chosen to terminate Calautti on the basis of the threatening post alone, it still would not be a clear violation of Calautti's First Amendment rights. "[T]he First Amendment does not preclude restrictions on certain categories of speech having little or no social value, and threats are one such category." *U.S. v. Parr*, 545 F.3d 491, 496-97 (7th Cir. 2008) (citing *Virginia v. Black*, 538 U.S. 343, 358-59 (2003)). "A statement qualifies as a 'true threat,' unprotected by the First Amendment, if it is 'a serious expression of an intent to

commit an act of unlawful violence to a particular individual or a group of individuals.'" *Id.* at 497 (citations omitted). Once Dean Shanahan was satisfied that the email he reviewed contained an authentic post from Calautti's Facebook account, he was able to discipline Calautti without running afoul of the First Amendment. It was reasonable for Dean Shanahan to find that Calautti made the Facebook post and that he meant the post to be the true threat it appeared to be.

Calautti's claims against the SAA Board Members and Provost Robel in her individual capacity fare no better under the qualified immunity analysis. The facts before the Court show that Calautti received due process at all stages of his disciplinary process. His initial hearing before the Office of Student Ethics was delayed at his request to give him time to prepare, and he was allowed to review his OSE case file prior to the hearing. At that hearing, he was allowed to explain himself and to call witnesses. Calautti had a right to appeal the outcome of that proceeding—a deferred suspension—and chose not to.

Calautti attended a hearing with Dean Shanahan and was given an opportunity to explain himself. Unsatisfied with his explanation, Dean Shanahan notified Calautti of his decision to terminate him and his right to appeal to a mediation panel. Calautti submitted a written statement and met with law professor Steve Sanders, the chair of the mediation panel, in preparation for the mediation. Calautti stated his case to the mediation panel, which recommended that Dean Shanahan reconsider his decision to terminate Calautti. But Dean Shanahan notified Calautti that he would not reconsider, and informed Calautti of his right to appeal to the SAA Board, which Calautti did. Calautti had another hearing, this time before the SAA Board, where he was represented by a law student at IU Bloomington and worked with Professor Sanders to prepare his defense. At the hearing, Calautti stated his case once more and called a witness. The SAA Board

ultimately recommended to Provost Robel that she uphold Dean Shanahan's decision to terminate Calautti, and Provost Robel agreed to uphold that decision in a five-page letter to Calautti.

Given the extensive process afforded to Calautti during his disciplinary proceedings at IU, the Court finds that it was reasonable for all individual defendants to believe they were complying with Calautti's constitutional due process rights. Because the Defendants did not violate a clearly established constitutional right, they are entitled to qualified immunity. Thus, all claims against all defendants in their individual capacities are **dismissed**.

### IV.    <u>CONCLUSION</u>

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment ([Filing No. 41](#)) as to all claims against each Defendant. All claims against Provost Lauren Robel, in her official capacity, are barred by sovereign immunity and are therefore **DISMISSED**. All claims against Provost Lauren K. Robel, Dean James Shanahan, and SAA Board of Review Members One, Two, Three, Four, Five, and Six in their individual capacities are barred by qualified immunity and are therefore **DISMISSED**. Because this Order grants summary judgment in favor of Defendants on all of Plaintiff Peter Calautti's claims, the Court will issue a final judgment order pursuant to Federal Rule of Civil Procedure 58 separately.

**SO ORDERED.**

Date:  8/7/2019

_Tanya Walton Pratt_
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jay Meisenhelder
JAY MEISENHELDER EMPLOYMENT & CIVIL RIGHTS LEGAL SERVICES PC
jaym@ecrls.com

Melissa A. Macchia
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
mmacchia@taftlaw.com

Michael C. Terrell
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
mterrell@taftlaw.com